Victor Sandoval (SBN 344461)
**ALMEIDA LAW GROUP LLC**
3415 S. Sepulveda Blvd Suite 1121
Los Angeles, California 90034
(562) 534-5907
victor@almeidalawgroup.com

Raphael Janove (SBN 361193)
**JANOVE PLLC**
115 Broadway, 5th Fl.
New York, NY 10006
(646) 347-3940
raphael@janove.law

*Attorneys for Plaintiff & the Putative Classes*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICKI APAYDIN, *individually and on behalf of all others similarly situated,* <br><br> Plaintiff, <br><br> vs. <br><br> ROVER GROUP, INC. <br><br> Defendant. | Case No.: 2:26-cv-4215 <br><br> **CLASS ACTION COMPLAINT** <br><br> 1. VIOLATIONS OF CAL. PENAL CODE § 631 (CIPA); <br> 2. VIOLATIONS OF CAL. PENAL CODE § 632 (CIPA); <br> 3. VIOLATIONS OF CAL. CIV. CODE § 1798.100(A)-(B) (CCPA); <br> 4. VIOLATIONS OF CAL. CIV. CODE § 1798.100(C) (CCPA); <br> 5. VIOLATIONS OF CAL. CIV. CODE § 1798.150(A) (CCPA); <br> 6. VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200 (UCL); <br> 7. BREACH OF IMPLIED CONTRACT; <br> 8. UNJUST ENRICHMENT; <br> 9. VIOLATIONS OF WASH. RCW 19.86 (WCPA) <br> 10. DECLARATORY RELIEF, CAL. CIV. CODE § 1060 |

-1-

11. DECLARATORY RELIEF, 28 U.S.C. §§ 2201-2202

## **DEMAND FOR JURY TRIAL**

-2-

## CLASS ACTION COMPLAINT

Plaintiff Nicki Apaydin ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action lawsuit against Rover Group, Inc. ("Rover" or "Defendant") and alleges, upon personal knowledge as to their own actions and their counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. This class action lawsuit is brought on behalf of all consumers whose private browsing and behavioral information, location data, and personal identifiers (collectively "Sensitive Information") was unlawfully and without authorization, collected and disclosed by Rover to third-party advertising and data-analytics companies without consent.

2. Defendant's primary mode of engaging with its user base is through the Rover mobile application (the "App"), a smartphone application through which pet owners find and hire dog walkers, pet sitters, boarders, and other related pet-care services throughout the United States.

3. Millions of pet owners use the App to arrange care for their pets.

4. But unbeknownst to any of them, Rover—through the App—collects and discloses users' Sensitive Information including, but not limited to, the specific services a user solicits and when the user solicits that service.

5. In order to position itself as one of the foremost providers of pet services in the world as well as to acquire huge amounts of personal data and Sensitive Information, Rover has made numerous promises and representations regarding its data privacy and security practices.

6. While it may not be facially apparent, the need for robust data security and privacy practices is particularly acute because App users' browsing behavior, location data, and in-app communications may, for example, transmit absence patterns and other potentially sensitive inferences. That is, if an App user searches

for a dog sitter for a particular period of time, a recipient of this search could infer that the User will not be at home for that period.

7.     Appreciating the importance of user trust and privacy, Rover explicitly promises that no third-party tracking takes place on the App, assuring users that "We only use data to improve your pet care experience" and "We will never sell your data to third parties" on one of the App's first screens.

8.     This promise unmistakably states that user interactions with the App are *not* transmitted to advertisers.

9.     Contravening its duties and promises, Rover embeds software including, but not limited to, Google Analytics and Google Ads/DoubleClick (together, the "Tracking Technologies") throughout the App.

10.     These Tracking Technologies capture and transmit users' Sensitive Information, including, but not limited to, page views and search queries, user identifiers, device information, location data, search histories for pet care services, viewing patterns of caregiver profiles, messaging activity indicators, booking histories, and other behavioral metadata, to third-party marketing and analytics entities for behavioral profiling and ad targeting.

11.     The Tracking Technologies are installed in the App through Software Development Kits ("SDKs"), pre-installed software that secretly work in the background, starting automatically when a user opens the App and operate continuously while the App remains open.[1]

12.     These Tracking Technologies collect data about the App's users including their identities and the specific pages they visit in the App.

13.     These data transfers occur surreptitiously and without meaningful disclosure, informed consent, or any other form of user authorization, violating common law, several privacy statutes, and Defendant's own express representations.

---

[1] What is an SDK?, https://www.redhat.com/en/topics/cloud-native-apps/what-is-SDK (last visited July 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

14. Plaintiff brings this action to hold Rover accountable for its unlawful practices, to secure statutory and equitable relief for those similarly affected, and to vindicate the privacy rights of all users whose Sensitive Information was improperly disclosed through Defendant's use of Tracking Technologies.

15. Plaintiff asserts individual and representative claims for: (i) violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631; (ii) violations of CIPA, Cal. Penal Code § 632; (iii) violations of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.100(a) and (b); (iv) violations of the CCPA, Cal. Civ. Code § 1798.100(c); (v) violations of the CCPA, Cal. Civ. Code § 1798.150(a); (vi) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; (vii) breach of implied contract; (viii) unjust enrichment; (ix) violations of the Washington Consumer Protection Act ("WCPA"), RCW 19.86; (x) declaratory relief under Cal. Civ. Code § 1060; and (xi) declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

## PARTIES

16. Plaintiff Nicki Apaydin is an adult citizen who has resided in Thousand Oaks, California at all times relevant hereto.

17. Defendant Rover Group, Inc. is a corporation organized under the laws of Delaware, with its principal place of business at 720 Olive Way, 19th Floor in Seattle, Washington 98101.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

19. This Court has personal jurisdiction over Rover because Defendant has purposefully availed itself of the privilege of conducting business in California,

including by directing the App and its services to California residents, and Plaintiff's claims arise directly from Defendant's contacts with this forum.

20. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, Plaintiff resides in this District, and Defendant has directed its business activities into this District and caused harm to Plaintiff and Class Members residing in this District.

21. Plaintiff is domiciled in Thousand Oaks, California, which is located in Ventura County. Pursuant to Local Rule 2-3, this action is assigned to the Western Division of this Court.

## COMMON FACTUAL ALLEGATIONS

## I. BACKGROUND ON GOOGLE'S TRACKING TECHNOLOGIES

22. Google LLC operates Google Analytics, a leading web analytics service that website owners use to understand user behavior, measure traffic, and optimize site performance.

23. Google encourages businesses and website owners to use Google Analytics to gather insights about user interactions, such as page views, session duration, and conversions, which can be leveraged for advertising and other marketing activities.

24. Google Analytics functions as a sophisticated advertising intelligence platform. Advertisers use Google Analytics to build remarketing lists of users who visited specific pages, track conversion paths from initial ad exposure through final purchase, create "lookalike audiences" of potential customers, and export user segments directly to Google Ads for immediate targeting. Google's own documentation confirms that "[a]nalytics audiences can be shared with Google Ads to create remarketing campaigns."[2]

25. Central to Google Analytics is a snippet of code (commonly referred to

---

[2] Google Analytics Help, Activate Google Analytics audiences in Google Ads, https://support.google.com/analytics/answer/3450482 (last visited July 28, 2025).

-6-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

as the Global Site Tag ("gtag.js") or Google Analytics tag) that, once embedded, enables the tracking of website visitors' actions and the collection of related data.[3]

26.    According to Google's documentation, this snippet helps determine when users perform key actions—*e.g.*, viewing a page, clicking a link, or making a purchase—so that site owners can accurately measure engagement and conversions.[4]

27.    This data is transmitted alongside a user's uniquely identifying information, including Google Client IDs ("CID"), a unique numeric string which specifically identifies a Google user.

28.    The CID is a persistent identifier that can be linked to specific individuals across apps, browsers, and devices. By linking user interactions across different sessions, it helps businesses understand user engagement and identify trends.

29.    When a user accesses a webpage containing Google Analytics code, their interaction data is transmitted to Google's servers in real time.

30.    This data transmission does not occur unless the Google Analytics tag is deliberately installed on the webpage.

31.    The process of setting up Google Analytics is multi-step and must be initiated by the website owner, including creating a property within Google Analytics, placing the tracking code on the website, and configuring data-sharing settings.[5]

32.    Moreover, site owners retain control over which events are tracked and how data is configured in their settings.[6]

---

[3]    *Get Started with Google Tag* https://support.google.com/analytics/topic/12403939?hl=en&ref_topic=14088998&sjid=12500510714154886837-NC (last visited July 30, 2025).

[4] *About events*, https://support.google.com/analytics/answer/1033068 (last visited July 30, 2025).

[5] *Set up Analytics for a Website*, https://support.google.com/analytics/answer/9304153 (last visited July 30, 2025).

[6] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

33. Google explains that implementing Google Analytics enables site owners to "measure your advertising ROI as well as track your Flash, video, and social networking sites and applications."[7]

34. As part of the Google Analytics Terms of Service, website owners must comply with applicable privacy laws and are responsible for disclosing the use of Google Analytics to their end users, including obtaining any necessary consents.[8]

35. Therefore, any information collected in violation of Google's policies or the site owner's legal obligations, would be transmitted only if the site owner chose to implement and configure Google Analytics in such a manner.[9]

36. Google places responsibility on website owners to ensure they have provided sufficient notice to users and obtained appropriate consent where required. Google's documentation and policy framework stress transparency and legal compliance with data collection and usage.[10]

37. The other major marketing tool in the Google suite is Google DoubleClick, a comprehensive advertising technology platform that features a real-time bidding system where advertisers bid on individual users in milliseconds based on their profiles, follow users across devices to create unified profiles, show dynamic ads featuring exact products or services previously viewed, and target users based on inferred interests across millions of websites.

38. The transmission of data to Google DoubleClick is particularly revealing. DoubleClick is not an analytics tool; rather, it is Google's dedicated

---

[7] *Google Universal Analytics*, https://exchange.adobe.com/apps/ec/102829/google-universal-analytics (last visited July 30, 2025).

[8] *Data Privacy and Security*, https://support.google.com/analytics/topic/2919631?hl=en&ref_topic=1008008,3544742,2986333,&sjid=12500510714154886837-NC (last visited July 30, 2025).

[9] *Personal Data and Google Analytics*, https://support.google.com/analytics/answer/7667196 (last visited July 30, 2025).

[10] *Id.*

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

advertising technology platform designed specifically to:

    a. Build comprehensive user profiles across websites;

    b. Enable behavioral targeting and retargeting;

    c. Facilitate real-time bidding for advertising inventory;

    d. Track conversions and attribute sales to specific ads;

    e. Create "lookalike audiences" for expanded targeting.[11]

39.   Google's advertising tools, including the Tracking Technologies, are implemented by embedding a specialized JavaScript snippet into a website or smartphone app's source code. They are automatically activated upon a user's arrival. These snippets are designed to initialize a comprehensive data collection mechanism that begins logging user interactions immediately as the webpage loads.

40.   Once activated, these Tracking Technologies capture a wide range of user inputs and behaviors. They record keystrokes, mouse movements, clicks, scrolling behavior, and even time spent on specific portions of a page. Every interaction, whether it involves entering data into form fields or simply navigating between pages, may be documented.

41.   The captured data is then automatically transmitted in real time to remote servers, effectively duplicating all electronic communications that take place between the user and the website. The data transmitted in these contexts often includes sensitive personal information such as login credentials, contact details, browsing data, and other confidential information.

## II.   GOOGLE MONETIZES USER DATA

42.   The continuous transmission of detailed user interaction data creates a comprehensive record of the user's online behavior. This practice involves the interception and storage of Sensitive Information and other confidential communications.

---

[11] *About Audience Segments*, https://support.google.com/google-ads/answer/2497941?hl=en (last visited July 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

43.     Google uses these Tracking Technologies to monetize user data. Google's SEC filings states: "We generate revenues primarily by delivering relevant, cost-effective online advertising."[12]

44.     By using the Tracking Technologies, advertisers can specifically target users based on their revealed behaviors. Pet product companies, for example, may identify active pet owners, travel service providers target users who book pet care before trips, and insurance companies leverage behavioral data to identify and market to specific risk profiles. This targeting extends across Google's entire advertising network, following users wherever they browse online.[13]

45.     Upon installation and every time a user opens or navigates the App, the Tracking Technologies initialize automatically and transmit granular event data— including each page or screen visited, search terms entered, service categories viewed, booking attempts, device identifiers, and the CID uniquely assigned to that user—to Google-controlled servers.

46.     As a result, third-party marketing and analytics companies learn—and can permanently store—highly specific details about users' personal data and in-app behavior.

47.     Here, this means that the Tracking Technologies transmit App users' prospective transactions from the moment those users merely browse local walkers or sitters, even when they have not made an account, had been explicitly promised that their browsing would not be tracked, and been explicitly promised that their interactions with the App would not be subject to third-party tracking.

48.     By implementing the Tracking Technologies on the App, Defendant

---

[12] Alphabet Inc., Annual Report (Form 10-K) at 10 (Feb. 2, 2025), https://abc.xyz/assets/59/ff/66de11a3bfa7db6cb929ba12a01b/6b3f31ad08de72f11d32f2b4f712b918.pdf (last visited July 30, 2025).

[13] Englehardt & Narayanan, Online Tracking: A 1-million-site Measurement and Analysis, Proceedings of the 2016 ACM SIGSAC Conference 1388, 1396 (2016), https://www.cs.princeton.edu/~arvindn/publications/OpenWPM_1_million_site_tracking_measurement.pdf (last visited July 30, 2025).

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

knowingly allows a third party to track user Sensitive Information with the App, knowing that these interactions will be used for advertising purposes.

## III. ROVER SECRETLY EMBEDDED TRACKING TECHNOLOGIES IN ITS APP.

49. Network traffic analysis reveals that Rover embedded Tracking Technologies that actively transmit user data to Google's servers from the moment its App is opened.

50. Upon installation and every time a user opens or navigates the App, the Tracking Technologies initialize automatically and intercept electronic communications between the user and the App, including the specific pages a user viewed in the App, the service categories viewed, booking attempts, device identifiers, and the CID uniquely assigned to that user.

51. In the App, Tracking Technologies identify users individually through their CID, along with the specific pages that the user visits.

52. In the screenshots below, for example, the user's CID is passed to Google along with the name of the dog trainer whose services the user browsed.

*[Remainder of page intentionally left blank]*

-11-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*Figure 1: Image of a screen in the App where a user shops for a specific service.*

*[Remainder of page intentionally left blank]*

-12-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

```
METHOD: POST +

URL

+ https://analytics.google.com/g/collect?v=2&tid=G-TDDJRNWB1T&gtm=45je54s1v888651
881z86354917za200zb892043848&_p=1746027527800&gcs=G111&gcd=13t3t3t3t511&npa=0&dma
=0&tag_exp=101509156-103051953-103077950-103106314-103106316-103116026-103173737-
103173739~103200004~103233424&ptag_exp=103051953-103077950-103106314-103106316-10
3116025~103173737~103173739~103200001&gdid=dN2JhM2&cid=1290534120.1746027510&ul=e
n-us&sr=393x852&frm=0&pscdl=noapi&_eu=AAAAAAI&_s=1&sid=1746027514&sct=1&seg=0&dl=
https%3A%2F%2Fwww.rover.com%2Faccount%2Fcontinue%2F%3Faction%3Dsign_up%26next%3D%
252Ftraining%252Fmembers%252Fmarcus-f-ill-run-your-dog-and-add-training%252Fconta
ct%252F%253Fneeds_app_auth%253Dtrue&dr=http%3A%2F%2Fwww.rover.com%2Ftraining%2Fm
embers%2Fmarcus-f-ill-run-your-dog-and-add-training%2F&dt=Sign%20Up%20or%20Sign%2
0In&en=test_event&ep.foo=bar&tfd=6194
```

*Figure 2: Network traffic from the screen in Figure 1, showing that the user's selection of that specific service is transmitted to Google, along with the user's personally identifiable CID.*

53.     Such disclosures of an individual's private browsing are themselves an incursion on a protected privacy right and an intrusion upon communications in which App users have a reasonable expectation of privacy.

**IV.     ROVER SELLS SENSITIVE INFORMATION IN VIOLATION OF ITS PROMISES.**

54.     When users download and open the App, they are presented with a screen that explicitly promises: "We only use data to improve your pet care experience" and "We will never sell your data to third parties."

*[Remainder of page intentionally left blank]*

-13-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*Figure 3: Defendant's explicit promise not to transmit user data from the App to advertisers.*

55.    The Tracking Technologies embedded in the App operate from the moment of initial app launch, without any affirmative or implied act of consent from the user.

56.    Because the Tracking Technologies embedded in the App operate from the moment of initial App launch, user data is transmitted before users can consent to the tracking by viewing a privacy policy, terms of service, or similar disclosure.

57.    Users have an especially well-founded privacy expectation in this context, where Defendant promised not to sell user data to advertisers just a few screens earlier.

58.    The payloads transmitted to Google's servers contain another particularly revealing parameter, the "NPA", or "Non-Personalized Advertising" parameter, which indicates that the App either permits or disallows the transmission of personalized advertising. The screenshot below shows that the NPA parameter in

-14-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

the Google DoubleClick SDK installed in the App is set to 0, meaning that personalized ads are permitted.

*Figure 4: Network traffic from the App showing that app users are served targeted advertisements in the App.*

59.    By configuring the SDK with NPA=0, Defendant necessarily enables and authorizes Google to use the transmitted user data including browsing patterns, search queries, and service preferences to build behavioral profiles for advertising purposes. This configuration choice demonstrates that Defendant not only shares user data with Google but specifically authorizes its use for commercial advertising targeting.

60.    Rover deliberately transmits user data to Google Analytics and Google DoubleClick in a way that constitutes a "sale" of data under applicable law because Rover receives valuable consideration from Google in exchange for the data, including: (i) free access to Google's sophisticated analytics platform that would otherwise require payment for enterprise-level features; (ii) enhanced ad targeting capabilities that increase Defendant's advertising ROI; (iii) preferential treatment in Google's advertising ecosystem; and (iv) access to Google's lookalike audience tools for user acquisition.

61.    The data transmission is configured specifically for commercial advertising purposes, as evidenced by the NPA parameter being set to "0" to enable personalized advertising.

62.    Rover derives direct and indirect monetary benefits from this arrangement through (i) reduced customer acquisition costs via improved ad targeting; (ii) increased conversion rates from retargeting campaigns; and (iii)

-15-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

competitive advantages in digital marketing.

63.    Rover's data sharing exceeds what is necessary to provide the pet-care marketplace service users requested, instead serving Defendant's separate commercial interests in advertising and user acquisition.

64.    Despite its promise of not selling user data to third parties, Defendant permits the largest online advertiser in the world to serve targeted advertisements to App users based on information they enter the App.

65.    By submitting App users to behavioral advertising, Defendant directly contradicts its stated purpose of permitting user browsing without third-party advertising.

66.    Likewise, by secretly implementing tracking while promising not to share data, Rover has failed to implement reasonable security procedures, essentially creating a backdoor for Google while assuring users the door was locked.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

67.    Plaintiff Nicki Apaydin is and at all relevant times has been a resident of Thousand Oaks, California.

68.    On or about March 2022, while she was in California, Plaintiff downloaded and opened the Rover App on her mobile device to search for pet-sitting services for her upcoming travel plans.

69.    Upon opening the App, and before being prompted to create an account, Plaintiff was presented with a screen containing Rover's assurance that it only uses user data to "improve your pet care experience" and "will never sell your data to third parties."

70.    Plaintiff relied on the prominent, unequivocal promise displayed directly within the App when deciding to proceed with entering her personal information.

71.    After viewing this privacy assurance, Plaintiff proceeded to browse the App and input detailed information to search for pet-sitting services including her

-16-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

name, her location, the dates she needed pet-sitting services, information about her pets, and her service preferences and requirements.

72.    All of this information was entered before Plaintiff was required to create an account, while she reasonably believed—based on Rover's explicit privacy assurance—that her browsing activity and the information she provided would not be tracked or shared with third parties.

73.    At no point before or during this initial browsing and information-entry process was Plaintiff provided with any notice that her interactions were being recorded and transmitted to Google Analytics, Google Ads/DoubleClick, or any other third-party tracking services.

74.    Plaintiff did not click on, view, or otherwise access any hyperlinks to Defendant's Terms of Use or Privacy Policy during this initial visit.

75.    Plaintiff had not checked any box, clicked any button, or taken any other affirmative action indicating consent to be recorded or to have her communications intercepted by Google or any other third party when she entered her personal information and pet-sitting requirements.

76.    Plaintiff was unaware at the time that her information—including her name, location, travel dates, and pet-care needs—was being intercepted in real time and disclosed to third-party advertising and analytics companies.

77.    Had she known that Defendant was using technologies like Google Analytics and Google Ads to track and record her browsing activity and personal information despite the explicit "no tracking" assurance, Plaintiff would not have used the App or would have limited the information provided.

78.    Plaintiff's disclosure of her travel dates and home location for pet-sitting services was particularly sensitive, as it revealed when her home would be vacant—information that has significant security implications beyond mere privacy concerns.

79.    As a result of Defendant's conduct, Plaintiff's privacy rights were violated, her personal information was disclosed without consent, and Plaintiff

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

suffered harm including loss of privacy, exposure to targeted advertising, and the security risks associated with the unauthorized disclosure of her absence schedule.

## A. Plaintiff's And the Class Members' Claims Are Not Arbitrable

80. Rover's Terms of Service (the "Terms") contain an unconscionable dispute resolution procedure that "is not arbitration as envisioned by the FAA[.]" *See Heckman v. Live Nation Entm't*, 120 F.4th 670, 690 (9th Cir. 2024). Instead of traditional bilateral arbitration, Rover's Terms effectively require only consumers—not Rover—to arbitrate claims. The Terms also mandate a batching and bellwether process that unconscionably delays the resolution of arbitrations, and then allows Rover to require arbitration claimants to go back to court. The Terms also contain additional one-sided and unconscionable provisions that, along with the so-called "arbitration" process, render the Terms' entire dispute resolution provisions unenforceable.

81. The Terms mandate "that any and all disputes or claims that arise between you and Rover relating to the Rover Service, interactions with others on the Rover Service, or these Terms (including any alleged breach of these Terms)" must be arbitrated, although a court retains jurisdiction as to threshold issues of arbitrability. Terms § 17.1

82. However, this is not a mutual agreement to arbitrate, but rather a unilateral one. The Terms contain a series of exclusions that allow Rover to bring claims against individuals in court.

83. To start, Section 17.1 excludes from arbitration "claims brought by Rover arising out of or related to a violation of Section 4.1."

84. In turn, Section 4.1, which is entitled "Your conduct on the Rover Service," contains a long list of prohibitions and requirements for conduct by individuals in connection with the Rover service. If an individual breaches any of these provisions, Rover can sue the individual in court. Given that Section 4.1's breadth encompasses nearly every conceivable grounds for Rover to have a claim

against a user, the Terms effectively ensures that Rover can sue its users in court while only users must arbitrate any of their claims against Rover.

85. Section 17.1 also excludes from arbitration any intellectual property claims seeking equitable and injunctive relief. This carve out is intended to allow Rover to avail itself of the judicial system to protect its intellectual property without being forced to go to arbitration. It is far more likely that Rover will have a claim against a consumer for a violation of intellectual property rights than the other way around.

86. The Terms also contain an unconscionable class action waiver that also forbids the arbitrator from "consolidat[ing] or join[ing] more than one person's or party's claims and may not otherwise preside over any form of a consolidated, representative, or class proceeding." Terms § 17.3. Notwithstanding the prohibition on consolidation, Section 17.11 of the Terms contain a "Bellwether Arbitrations" provision that serves to consolidate all arbitrations.

87. The bellwether provision mandates that "if, in close proximity to one another, 20 or more arbitration demands of a similar nature are asserted against or on behalf of the same or related parties," that, instead of bilateral arbitration, the arbitrations proceed in a bellwether-batching process. This process significantly delays any individual seeking to arbitrate a claim—and potentially means an individual loses the right to arbitrate altogether.

88. Initially, the "Claimants will collectively select 5 demands and respondents will collectively select 5 demands, for a total of 10 demands." These arbitrations will be individually arbitrated.

89. But the remaining demands "will not be arbitrated (or otherwise litigated in any venue)" and "JAMS will immediately place any such matters on administrative suspension."

90. After the 10 bellwether cases are arbitrated, the Terms mandate that all parties engage in a global mediation.  If the mediation does not successfully resolve

-19-

within 90 days, the remaining arbitrations will proceed on an individual basis.

91.    However, any party can opt out of arbitration after the global mediation. This means that Defendant has the option to prevent all but the initial 10 bellwether cases from proceeding to arbitration, and push every other case back into court.

92.    Notably, the Terms state that "the right to proceed in court under the preceding sentence applies only to the unresolved demands that were filed and subjected to the protocols set forth in this Section 17.11." So only consumers who file in arbitration and await their claims being delayed by the bellwether and mediation process will then have the option to return to court.

93.    In sum, the Terms do not contain an agreement to "settle" a dispute by arbitration within the meaning of the FAA. *See* 9 U.S.C. § 2. Rather, it is an agreement to undergo a test process whereby no individual knows if his or her claim will be arbitrated. In the meantime, Rover can game the system and decide that everyone starts over and goes back to court. Moreover, an agreement to reach a global settlement through mediation is not, by definition, an agreement to "settle" a dispute by arbitration.

94.    As explained in *Heckman*, a batched, bellwether dispute resolution process is not the "fair and efficient alternative to bilateral judicial proceedings" contemplated by the Federal Arbitration Act ("FAA"). *See Heckman*, 120 F.4th at 689; *see also id*. at 690-93 (Vandyke, J., concurring).

95.    In addition, the Terms also contain a series of unconscionable provisions that proscribe the relief users may seek.

96.    Section 17.3 of the Terms prohibit anyone from seeking public injunctive relief.

97.    Section 16.1 of the Terms waive "any indirect, special, incidental, or consequential damages."

98.    Section 16.2 of the Terms then artificially cap Defendant's liability to either (1) the amount an individual paid Defendant within 12 months "preceding the

-20-

event that gave rise to liability," or (2) $100.

99.    Section 16.3, entitled "No Liability for non-Rover actions," states that Rover is not liable in any amounts "arising out of or relating to the conduct of you or anyone else, including third-party services, in connection with the Rover Service."

100.    In addition, Section 2.3 states that Rover is not liable "for any claims, injuries, loss, harm and/or damages arising from and/or in any way related to your interactions or dealings with other users and the acts and/or omissions of Service Providers and Pet Owners, whether online or offline."

101.    Accordingly, because the dispute resolution provisions of Rover's Terms are unconscionable and do not require the resolution of claims through bilateral arbitration, none of Plaintiff's or the class members' claims are subject to arbitration and Rover's class waiver is invalid.

## TOLLING

102.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule.

103.    Plaintiff did not know (and had no way of knowing) that her Sensitive Information was intercepted and unlawfully disclosed to Google and potentially other third parties because Defendant kept this information secret.

104.    Plaintiff only became aware of the disclosure of her information in June 2025.

105.    Alternatively, applicable statutes of limitation have been tolled by other applicable rules or doctrines.

## CLASS ACTION ALLEGATIONS

106.    Plaintiff, on behalf of herself and all others similarly situated, seeks relief under Federal Rule of Civil Procedure 23 on behalf of the following classes:

**The Class**

All individuals who used the Rover App and had their electronic

-21-

communications containing Sensitive Information intercepted and transmitted to third parties without their knowledge or consent (the "Class").

**The California Subclass**

All individuals who, while residing in California, used the Rover App and had their electronic communications containing Sensitive Information intercepted and transmitted to third parties without their knowledge or consent (the "California Subclass").

107. The following people are excluded from the class: (i). any judge or magistrate presiding over this action and members of their families; (ii). Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and their current or former officers and directors; (iii). persons who properly execute and file a timely request for exclusion from the Class; (iv). persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v). Plaintiff's counsel and Defendant's counsel; and (vi). the legal representatives, successors, and assigns of any such excluded persons.

108. Plaintiff reserves the right to revise or amend the definition of the Class or California Subclass based on the discovery of new information.

109. Numerosity: The exact number of members of the Classes is unknown but, upon information and belief, it is estimated to number in the thousands, and individual joinder in this case is impracticable. Members of the Classes can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice and notice can be provided through techniques similar to those customarily used in other class action lawsuits.

110. Typicality: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff, and the members of the Classes, sustained damages arising out of Defendant's wrongful conduct, misrepresentations, false statements,

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

concealment, and unlawful practices, and Plaintiff and members of the Classes sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

111. Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that conflict with, or are antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

112. Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

   a. Whether Defendant violated CIPA;

   b. Whether Defendant's use of Tracking Technologies constitutes unauthorized interception of electronic communications;

   c. Whether Defendant unlawfully intercepted and manipulated user communications;

   d. Whether Defendant intentionally interfered with Plaintiff's and Class Members' prospective economic advantage;

   e. Whether Defendant was unjustly enriched by collecting and monetizing class members' Sensitive Information;

   f. Whether Defendant's representations were deceptive;

   g. Whether Defendant's practices violated privacy laws and regulations;

   h. Whether Defendant was unjustly enriched by intercepting Class Members' communications; and

   i. Whether Plaintiff and Class Members are entitled to damages, restitution, and injunctive relief

-23-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

113.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

114.    Such particular issues include, but are not limited to:

   a.  Whether Defendant intercepted electronic communications without consent in violation of CIPA;

   b.  Whether Defendant's use of Tracking Technologies constitutes an interception of communications under CIPA;

   c.  Whether Defendant obtained proper consent before intercepting users' interactions with the App;

   d.  Whether Defendant's actions violated App visitors' reasonable expectations of privacy.

115.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by Defendant's scheme.

## CAUSES OF ACTION

### COUNT I
**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631, *et seq.***
***(On Behalf of Plaintiff & the California Subclass)***

116.    Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

118.    California Penal Code § 631(a) establishes liability for any person who:

> [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic

-24-

communication system,

Or

[W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

[U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

119. California courts have consistently held that Section 631(a) is not limited to traditional telephone communications but applies broadly to modern electronic communications, including those transmitted via the Internet. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (holding CIPA applies to Internet communications).

120. California courts have specifically recognized that the use of software code to intercept and record a user's website communications, without the user's knowledge or consent, can constitute a violation of CIPA. *See, e.g.*, *Graham v. Noom, Inc.*, 533 F. Supp. 3d 823 (N.D. Cal. 2021); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107 (9th Cir. May 31, 2022).

121. The Tracking Technologies embedded on the App, including the Google SDK, constitute a "machine, instrument, contrivance, or ... other manner" within the meaning of Section 631(a).

122. These Tracking Technologies intercept and record electronic communications between website and App users and the websites and apps they visit.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

123. At all relevant times alleged herein, by implementing and using the Tracking Technologies in its App, Defendant:

   a. Intentionally tapped, electrically or otherwise, the lines of internet communication between Plaintiff and Class members on the one hand, and the App on the other hand;

   b. Willfully and without the consent of all parties to the communications, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and Class members while those communications were in transit or passing over wires, lines or cables;

   c. Used the information obtained through such unauthorized interception for its business purposes, including marketing optimization and lead generation; and

   d. Aided, agreed with, employed, and conspired with third parties including Google to implement the Tracking Technologies and to accomplish the unauthorized interception of communications.

124. Plaintiff and Class members did not consent to any of Defendant's actions in implementing or using the Tracking Technologies to intercept their communications through the App. Specifically:

   a. Defendant never obtained express consent from Plaintiff or Class members before intercepting their communications;

   b. Defendant began intercepting communications immediately upon a user's visit to the App, before any opportunity to review terms of service or privacy policies;

   c. Users were not presented with Defendant's Terms of Use or Privacy Policy while using the App;

   d. Defendant never provided clear, conspicuous notice that users' interactions with the App would be recorded in their entirety and shared with a third party;

   e. Any purported consent was ineffective because the interception began before consent could be obtained and because the disclosures

-26-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

were inadequate to inform users of the actual scope and nature of the interception.

125. The information intercepted includes Sensitive Information including private browsing information, a transaction that by its nature involves the disclosure of private information.

126. Unless enjoined and restrained by this Court, Defendant will continue to commit these illegal acts. Plaintiff continues to desire to use the internet, including potentially the App, to search for information about and shop for pet-care services. However, Plaintiff has a reasonable fear that their communications will continue to be intercepted without their consent if they visit the App again.

127. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class members are entitled to:

    a. A preliminary and permanent injunction prohibiting Defendant from continuing their unlawful conduct;

    b. Statutory damages of $5,000 per violation; and

    c. Any other relief the Court deems proper.

128. Plaintiff and the Class members have suffered loss by reason of these violations, including but not limited to violation of their right to privacy.

## COUNT II
### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code § 632, *et seq.*
### *(On Behalf of Plaintiff & the California Subclass)*

129. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

130. Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

131. California Penal Code Section 632(a) provides that:

> [E]very person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the

-27-

communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished[.]

132. California Penal Code Section 632(c) defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, or other public proceeding in which the public is entitled to attend, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

133. The communications between Plaintiff and Class Members and the App constitute "confidential communications" within the meaning of Section 632(c) because Plaintiff had a reasonable expectation that her communications within the App, including browsing Defendant's services, would not be exposed to any parties aside from her and Defendant. Contravening this expectation and its own promise, Defendant intentionally used an electronic recording device—specifically, the Google Analytics SDK embedded within the App—to eavesdrop upon and record these confidential communications.

134. The Tracking Technologies each constitute an "electronic amplifying or recording device" within the meaning of Section 632(a) because they are specifically designed to capture, record, and transmit user interactions and communications in real-time.

135. Defendant intentionally implemented and activated the Tracking Technologies within its App with full knowledge that it would capture and record users' confidential communications, including their responses to sensitive questions.

136. Defendant's recording of Plaintiff's and Class members' confidential communications was accomplished without the consent of all parties to the communication, specifically:

-28-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a. Plaintiff and Class members never consented to having their confidential communications recorded by third-party analytics companies;

b. Defendant never obtained express consent before implementing the Tracking Technologies;

c. Users were not informed that their communications would be recorded and transmitted to third parties, including but not limited to Google;

d. No clear, conspicuous notice was provided regarding the scope and nature of the interceptions of confidential communications;

e. The interceptions began immediately upon opening the App, before users had any opportunity to review privacy policies or provide informed consent.

137. Defendant's conduct was undertaken intentionally and with knowledge that the Google Analytics would record confidential communications without proper consent from all parties.

138. The confidential communications that were unlawfully recorded include highly Sensitive Information that App users provided with reasonable expectations of confidentiality.

139. As a direct and proximate result of Defendant's violations of Section 632, Plaintiff and Class members have suffered harm including invasion of their privacy rights, violation of confidentiality, and loss of control over their Sensitive Information.

140. Unless enjoined and restrained by this Court, Defendant will continue to commit these violations. Plaintiff and Class members have a reasonable fear that their confidential communications will continue to be unlawfully recorded if they use Defendant's App.

141. Pursuant to California Penal Code Section 637.2, Plaintiff and Class members are entitled to:

a. A preliminary and permanent injunction prohibiting Defendant from

-29-

continuing their unlawful recording of confidential communications;

b. Statutory damages of $5,000 per violation;

c. Punitive damages for Defendant's willful and egregious violations of privacy; and

d. Any other relief the Court deems proper.

142. Plaintiff and Class members seek all available remedies under California Penal Code Section 632 and related provisions for Defendant's unlawful recording of confidential communications.

## COUNT III
### VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT
### California Civil Code § 1798.100(a) & (b)
### *(On Behalf of Plaintiff & the California Subclass)*

143. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

144. Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

145. Civil Code § 1798.100(a) requires that "A consumer shall have the right to request that a business that collects a consumer's personal information disclose to that consumer the categories and specific pieces of personal information the business has collected."

146. Civil Code § 1798.100(b) mandates that "A business that collects a consumer's personal information shall, at or before the point of collection, inform consumers as to the categories of personal information to be collected and the purposes for which the categories of personal information shall be used."

147. These provisions establish a clear requirement: businesses must provide transparent notice about data collection and use at or before the point when personal information is collected.

148. Defendant violated § 1798.100(b) by collecting Sensitive Information

-30-

through the Rover App before providing the required disclosures. Specifically:

a. The App begins tracking users immediately upon launch through embedded Google Analytics and Google Ads SDKs;

b. These SDKs collect Sensitive Information including device identifiers, browsing behavior, and search queries;

c. Users encounter Rover's in-app privacy assurance that directly contradicts the actual data collection occurring;

d. No notice is provided at or before collection regarding the categories of information collected or purposes of use;

e. The tracking occurs before users can create an account or access any privacy policy.

149. The Rover App's design specifically enables extraction of Sensitive Information from users before they can access any privacy disclosures, in direct violation of the "at or before the point of collection" requirement.

150. Even after collection, Defendant's disclosures are inadequate because they fail to inform consumers that their personal information will be:

a. Shared with Google Analytics and Google Ads/DoubleClick;

b. Used for behavioral advertising;

c. Combined with data from other sources for cross-device tracking;

d. Used for purposes beyond pet-care marketplace services.

151. Defendant's failure to provide clear disclosure at or before collection deprived Plaintiff and Class members of their ability to make informed decisions about whether to share their Sensitive Information.

152. As a direct result of these violations, Plaintiff and Class members suffered harm, including unknowing disclosure of Sensitive Information for commercial purposes and deprivation of their privacy rights under the CCPA.

153. Plaintiff and California Class members are entitled to declaratory relief that Defendant's practices violate § 1798.100(a) and (b), injunctive relief requiring compliance with disclosure requirements, and any other relief the Court deems

proper.

## COUNT IV

**VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT**
**California Civil Code § 1798.100(c)**
***(On Behalf of Plaintiff & the California Subclass)***

154.    Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

155.    Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

156.    The CCPA, Civil Code § 1798.100(c), provides that "A business shall not collect additional categories of personal information or use personal information collected for additional purposes without providing the consumer with notice consistent with this section."

157.    This provision establishes a fundamental purpose limitation principle: businesses may only use personal information for the specific purposes disclosed to consumers at or before the point of collection.

158. Defendant collected Plaintiff's and Class members' personal information through the App ostensibly for the purpose of providing a pet-care marketplace service, including connecting pet owners with walkers, sitters, and boarders.

159.    At the time of collection, Defendant represented through its "no tracking" promise that personal information would be used solely to facilitate pet-care services and would not be tracked or sold.

160.    However, Defendant subsequently used and continues to use this personal information for additional, undisclosed purposes, including but not limited to:

    a.  Targeted advertising through Google Ads/DoubleClick;

    b.  Behavioral profiling and analytics via Google Analytics;

-32-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

    c.  Cross-device tracking and user identification;

    d.  Commercial data monetization;

    e.  Marketing optimization and retargeting campaigns.

161.  These advertising and analytics purposes are materially different from and incompatible with the pet-care marketplace purposes for which the information was collected, especially given Defendant's explicit promise not to track users.

162.  Defendant never provided notice to Plaintiff or Class members that their personal information would be used for advertising, analytics, or other commercial purposes beyond pet-care services.

163.  Defendant's use of personal information for undisclosed purposes violated § 1798.100(c) and caused harm to Plaintiff and Class members, including loss of privacy, unauthorized commercialization of their data, and exposure to targeted advertising.

164.  Plaintiff and California Subclass members are entitled to injunctive relief, actual damages, and any other relief the Court deems proper for these violations.

## COUNT V
**VIOLATIONS OF CALIFORNIA CONSUMER PRIVACY ACT**
**California Civil Code § 1798.150(a)**
**_(On Behalf of Plaintiff & the California Subclass)_**

165.  Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

166.  Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

167.  The CCPA provides consumers with the right to hold businesses accountable if they do not take reasonable steps to safeguard personal information.

168.  To achieve the CCPA's objectives and safeguard consumers' information, subsection (e) of § 1798.100 requires a business that collects consumer

-33-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

personal information to "implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Section 1798.81.5."

169.   Similarly, Cal. Civ. Code § 1798.81.5(b) provides that a "business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

170.   As alleged in detail above, Defendant fails to adequately disclose that users' personal information collected through the Rover App is shared with third-party advertising and analytics companies.

171.   The App's "no tracking" promise creates a false sense of security while the embedded Tracking Technologies simultaneously capture and transmit personal information without users' knowledge or authorization.

172.   Defendant's sharing of personal information with Google Analytics and Google Ads/DoubleClick for analytics, advertising, and commercial purposes goes well beyond the disclosed purposes of facilitating pet-care services and constitutes a breach of Defendant's duties under Civil Code § 1798.150(a)(1).

173.   Further, Defendant's disclosure to third parties of and the unauthorized access by third parties to Plaintiff's and Class members' personal information through embedded Tracking Technologies constitute violations of Defendant's duty to implement and maintain reasonable security procedures and practices to safeguard such information, and thus constitute a violation of § 1798.150(a)(1) of the CCPA.

174.   Under Civil Code § 1798.150(a)(1)(A), Plaintiff and California Class members each are entitled to the greater of their actual damages or statutory damages of not less than $100 and up to $750 per consumer per incident, plus, under § 1798.150(a)(1)(C), any other relief that the court deems proper.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

175. On October 12, 2025, Plaintiff sent Defendant a Cal. Civ. Code § 1798.150(b) notice of non-compliance advising Defendant of its violations of the CCPA. Defendant's alleged subsequent implementation and maintenance of security procedures do not constitute a cure within the meaning of §1798.150(b).

176. Therefore, under Civil Code § 1798.150(a)(1)(A), Defendant is liable to Plaintiff and each of the California Class members for the greater of statutory damages of not less than $100 and up to $750 per consumer per incident or actual damages suffered because of Defendant's violations of the CCPA.

## COUNT VI
### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### *(On Behalf of Plaintiff & the California Subclass)*

177. Plaintiff incorporates each allegation set forth above as if fully set forth herein and further alleges as follows.

178. Plaintiff brings this claim individually and on behalf of the members of the California subclass against Defendant.

179. California's UCL, Cal. Bus. & Prof. Code § 17200 et seq., prohibits any "unlawful, unfair or fraudulent business act or practice."

180. The UCL provides for injunctive relief and restitution for violations of its provisions. The statute provides California consumers, businesses, and the public with protection from unfair, unlawful, and fraudulent business practices.

181. Defendant is a "person" within the meaning of Cal. Bus. & Prof. Code § 17201 and at all relevant times was engaged in "business acts or practices" within the meaning of Cal. Bus. & Prof. Code § 17200.

182. Defendant's business acts and practices as alleged herein violate the "unlawful" prong of the UCL because they violate numerous federal and state laws, including but not limited to (i) CIPA, §§ 631, 632; (ii) CCPA, Cal. Civ. Code §§ 1798.100, *et seq.*; and (iii) common law breach of implied contract based on Defendant's privacy promises.

-35-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

183. Each of these violations constitutes a separate and independent violation of the UCL's "unlawful" prong, and Plaintiff need only establish a violation of one law to prevail under this prong.

184. Defendant's business acts and practices also violate the "unfair" prong of the UCL. Defendant's conduct is "unfair" within the meaning of the UCL because:

    a. The harm to consumers from having their Sensitive Information secretly tracked and monetized substantially outweighs any utility of Defendant's conduct;

    b. The harm is substantial because users lose control over sensitive data including home addresses and absence patterns;

    c. The harm could not reasonably be avoided by consumers who were assured there would be "no tracking";

    d. Defendant's conduct violates established public policies protecting consumer privacy and data security.

185. Defendant's practice of promising users it "will never sell your data to third parties" while simultaneously implementing sophisticated Tracking Technologies configured for maximum commercial exploitation offends established public policy and is immoral, unethical, oppressive, and unscrupulous.

186. Any utility from Defendant's tracking practices could be achieved through privacy-protective means, such as obtaining informed consent or using non-personalized analytics, making the consumer harm unjustified.

187. Defendant's business acts and practices violate the "fraudulent" prong of the UCL because they are likely to deceive members of the public.

188. Defendant's prominent representation that it "will never sell your data to third parties" is likely to and did deceive reasonable consumers, including Plaintiff, into believing their browsing activity would remain private.

189. A reasonable consumer viewing Defendant's "no tracking" promise would not expect that:

-36-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

a.  Their every interaction would be captured by Google Analytics;

b.  Their data would be transmitted to Google's advertising platform;

c.  They would be assigned persistent tracking identifiers;

d.  Their information would be used for behavioral advertising;

e.  Their data would be monetized through the world's largest advertising network.

190.   Defendant knew or should have known that its privacy representations were false and misleading because Defendant itself configured the Tracking Technologies and set the NPA parameter to "0" to enable personalized advertising.

191.   Defendant's misrepresentations were material because privacy concerns and data practices influence consumers' decisions about which services to use, particularly for sensitive services involving home access.

192.   As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent business practices, Plaintiff and Class members have suffered injury in fact and lost money or property, including:

a.   The monetary value of their personal information, which Defendant monetized without compensation;

b.  Diminished value of the services received compared to the "no tracking" services promised;

c.  Loss of privacy rights and control over personal data; and

d.  Overpayment for services that were represented as privacy-protective but were not.

193.   Plaintiff and Class members paid for and used Rover's services in reliance on Defendant's representations about privacy and data practices. Had they known the truth, they would not have used the services or would have paid less for them.

194.   Plaintiff has standing to pursue this claim because she has suffered economic injury and has an interest in ensuring that Defendant's unfair and deceptive

-37-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

practices cease.

195.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Subclass seek:

    a. Restitution of all monies paid to Defendant during the relevant statutory period;

    b. Disgorgement of all revenues Defendant obtained through its unlawful practices;

    c. An order enjoining Defendant from continuing its unlawful, unfair, and fraudulent practices;

    d. An order requiring Defendant to implement privacy-protective measures and honor its "no tracking" promises;

    e. Such other relief as the Court deems proper.

196.    Plaintiff also seeks attorneys' fees under Cal. Code Civ. Proc. § 1021.5 as this action enforces important rights affecting the public interest.

## COUNT VII

### BREACH OF IMPLIED CONTRACT
### *On Behalf of Plaintiff & the Class*

197.    Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

198.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant

199.    Defendant explicitly assured Plaintiff and Class members through representations in the App that it would not disclose their data to third parties for advertising purposes.

200.    Plaintiff viewed and understood the privacy assurances made in the App before browsing Defendant's services.

201.    Plaintiff's use of the App was based on the understanding that her privacy would be respected, and she would not have used the App if Defendant's representations of user privacy not been made and the true nature of the App's

-38-

tracking been revealed.

202. Defendant nonetheless engaged in the unauthorized collection, use, and monetization of their private information and personal data.

203. An implied contract arose from Defendant's in-app and on-screen representations of user privacy, which induced users to explore the App through their promise and assurance of a tracking-free experience.

204. Users manifested assent by continuing past the screen on which this promise was made.

205. Users, including Plaintiff, specifically relied on Rover's privacy representations when:

    a. Choosing Rover over competitors with different privacy policies;

    b. Deciding to share home addresses for pet-sitting services;

    c. Browsing the App for services; and

    d. Scheduling services.

206. But for Rover's privacy promises, users would have used alternative platforms, limited the information they shared, and/or communicated with sitters outside the App.

207. Users, including Plaintiff, fully performed their duties under the implied contract by:

    a. Providing accurate information as required;

    b. Paying all service fees; and

    c. Following platform rules.

208. Rover's breach was material and went to the essence of the bargain because:

    a. Privacy was a fundamental term of the agreement;

    b. Rover's breach was willful and systematic;

    c. Rover's breach affected every single user interaction; and

    d. Rover profited from the breach through advertising revenue.

-39-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

209. Rover has been unjustly enriched by its breach, having derived additional advertising revenue and user-acquisition insights from the secretly harvested data.

210. Defendant's breach was material, willful, and went to the very essence of the parties' agreement—that users could browse pet-care services without being tracked or having their data shared with third parties.

211. As a direct and proximate result of Defendant's breach of the implied contract, Plaintiff and Class Members are entitled to recover:

  a. Compensatory damages in an amount to be determined at trial;

  b. The benefit of their bargain, namely the value of a truly private, non-tracking pet-care marketplace;

  c. Consequential damages flowing from the unauthorized disclosure of their personal information;

  d. Disgorgement of all profits Defendant obtained through its breach;

  e. Restitution of any amounts paid to Defendant while it was in breach;

  f. Declaratory relief that Defendant breached the implied contract;

  g. Injunctive relief requiring Defendant to honor its privacy promises;

  h. Pre- and post-judgment interest;

  i. Attorneys' fees and costs to the extent permitted by law;

  j. Such other relief as the Court deems just and proper.

## COUNT VIII
### UNJUST ENRICHMENT
### *On Behalf of Plaintiff & the Class*

212. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

213. Plaintiff brings this claim in the alternative to Count VII, individually and on behalf of the members of the Class against Defendant.

214. Defendant has been unjustly enriched at the expense of Plaintiff and

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Class members through its unauthorized collection, use, and monetization of their Sensitive Information.

215. Plaintiff and Class members conferred a benefit upon Defendant by providing valuable Sensitive Information.

216. Defendant received and retained this benefit by intercepting, collecting, and transmitting Plaintiff's and Class members' personal information to Google Analytics through embedded SDK technology without authorization or consent.

217. Defendant has been unjustly enriched in several ways including, but not limited to:

   a. Defendant derives commercial value from sharing users' Sensitive Information with third-party analytics companies like Google Analytics for marketing analytics, behavioral targeting, and user profiling purposes;

   b. Defendant avoided the substantial costs of obtaining proper consent, implementing adequate privacy protections, and securing lawful access to this valuable data;

   c. Defendant gained unfair competitive advantages by leveraging detailed data profiles to optimize its App and marketing without bearing the costs associated with compliant data collection; and

   d. The unauthorized collection of comprehensive user data increases the overall value and effectiveness of Defendant's App and the platforms of any third party who works with Google.

218. Defendant obtained these benefits through unlawful interception and unauthorized disclosure of Sensitive Information in violation of federal and state privacy laws.

219. Plaintiff and Class members provided their valuable Sensitive Information in the context of seeking confidential services with a reasonable expectation of privacy. Defendant actively concealed its data collection and sharing practices from users who were unaware their Sensitive Information was being intercepted and monetized.

-41-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

220. Defendant's retention of these benefits violates fundamental principles of fairness and equity, as Defendant has profited from the unauthorized exploitation of some of the most sensitive and valuable personal information without providing any compensation or benefit to the individuals whose privacy was violated.

221. Plaintiff and Class members have no adequate remedy at law for Defendant's unjust enrichment, as they cannot recover the specific value of their appropriated personal data through traditional damages calculations.

222. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and Class members are entitled to restitution and disgorgement of all benefits, profits, and value that Defendant has obtained through the unauthorized collection and use of their personal information.

223. Plaintiff and Class members seek judgment requiring Defendant to disgorge all profits, benefits, and value obtained through its unlawful conduct, together with interest thereon, and such other relief as the Court deems just and proper.

## COUNT IX
**VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT**
**RCW 19.86,** *et seq.*
***(On Behalf of Plaintiff & the Class)***

224. Plaintiff incorporates each allegation set forth above as if fully set forth herein.

225. The Washington Consumer Protection Act declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020

226. Defendant's conduct occurred in "trade or commerce" as it involves the sale of services to the public. RCW 19.86.010(2).

227. To prevail under the WCPA, a plaintiff must prove: (1) an unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) a public interest

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

impact; (4) injury to the plaintiff's business or property; and (5) causation. *Panag v. Farmers Ins. Co. of Washington*, 166 Wash.2d 27, 37 (Wash. 2009).

228.   Defendant engaged in unfair and deceptive acts by:

    a.   Promising users it "will never sell your data to third parties" while simultaneously tracking and selling that exact data;

    b.   Concealing the presence of Google Analytics and DoubleClick tracking;

    c.   Configuring tracking for maximum commercial exploitation;

    d.   Misrepresenting the purposes of data collection; and

    e.   Collecting Sensitive Information and data before users could review privacy policies.

229.   These acts are "unfair" because they cause substantial consumer harm that is not outweighed by benefits and could not be reasonably avoided by consumers who relied on Defendant's "no tracking" promise.

230.   These acts are "deceptive" because they had the capacity to deceive a substantial portion of the public. A reasonable consumer would be misled by Defendant's false privacy assurances.

231.   Defendant's conduct affects the public interest because:

    a.   It was directed to the public at large through its App;

    b.   Rover actively markets to thousands of Washington consumers;

    c.   The deceptive practices are part of Defendant's standard business model; and

    d.   Privacy violations affect fundamental consumer interests.

232.   Plaintiff and Class members suffered injury to their property interests in their personal data, which has economic value that Defendant misappropriated without compensation.

233.   Defendant's violations were willful, entitling Plaintiff to treble damages up to $25,000 per violation under RCW 19.86.140.

234. Plaintiff seeks injunctive relief, actual damages, treble damages, attorneys' fees under RCW 19.86.090, and all other available relief.

## COUNT X
### FOR DECLARATORY JUDGMENT OR RELIEF
### Cal. Civ. Code § 1060, *et seq.*
### *(On Behalf of Plaintiff & the California Subclass)*

235. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

236. Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

237. Under California law, "[a]ny person interested under a written instrument…or under a contract, or who desires a declaration of his or her rights or duties with respect to another…may, in cases of an actual controversy relating to the legal rights and duties of the respective parties," may maintain a complaint or cross complaint "for a declaration of his or her rights and duties." Furthermore, he or she "may ask for a declaration of rights or duties, either alone, or with other relief, and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time." Cal. Civ. Code § 1060.

238. As described above, Rover's Terms contain dispute resolution provisions and a purported arbitration clause that is substantively and procedurally unconscionable. This renders the clause unenforceable against Plaintiff and the class members.

239. An actual controversy of sufficient immediacy exists between the Plaintiff and the class members, on the one hand, and Rover, on the other hand, concerning their respective rights and duties under the Terms. Plaintiff contends that the dispute resolution provisions and purported arbitration clause contained within the Terms are void and unenforceable. Rovers contends and acts as if these Terms have legal force.

240. Plaintiff seeks a judicial determination of rights and duties and a

-44-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

declaration or judgement that the dispute resolution provisions and purported arbitration clause contained in the Terms are void and unenforceable against Plaintiff the class members.

241. A judicial declaration would advise Plaintiff and the class members of their rights and would advise Rover of its duties to Plaintiff and the class members other users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the purported arbitration process described in Rover's Terms.

242. Such a declaration would not only benefit Plaintiff and the class members, but would also inure for the benefit of the public at large. The Ninth Circuit has specifically held than an unconscionable arbitration clause is "contrary to" California's "fundamental policy" against enforcing such agreements. *E.g.*, *Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1083 (9th Cir. 2008) (per curiam); *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1067 (9th Cir. 2007) (per curiam). Moreover, Rover's Terms violate California's public policy against allowing corporate actors to unilaterally impose exculpatory clauses into contracts of adhesion, *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005) and, more broadly, violates "California's strong public policy to protect consumers against unfair and deceptive business practices," *see Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009), by insulating Rover from consumer claims based on unfair practices, like those alleged here. *See also McGill v. Citibank, N.A.*, 393 Cal.5th 945, 952 (2017) (articulating California's public policy against impediments to consumers' right to seek public injunctive relief under state law).

## COUNT XI
### FOR DECLARATORY JUDGEMENT OR RELIEF
### Federal Declaratory Judgment Act 28 U.S.C. §§ 2201-2202
#### *(On Behalf of Plaintiff & The Class)*

243. Plaintiff repeats and re-alleges all factual allegations contained in the foregoing paragraphs as if fully set forth herein.

-45-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

244.   Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

245.   Under federal law, "[i]n a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such." 28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.

246.   An actual controversy of sufficient immediacy exists between the Plaintiff and the class members, on the one hand, and Rover, on the other hand, concerning their respective rights and duties under the Terms. Plaintiff contends that the dispute resolution provisions and purported arbitration clause contained within the Terms are void and unenforceable. Rover contends and acts as if these provisions have legal force.

247.   Plaintiff seeks a judicial determination of rights and duties and a declaration or judgement that the dispute resolution provisions and purported arbitration clause contained in the Terms are void and unenforceable against them or against any class members.

248.   A judicial declaration would advise Plaintiff and the class members users of their rights and would advise Rover of its duties to Plaintiff and other users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the arbitration process described in Rover's Terms.

249.   Such a declaration would not only benefit Plaintiff and the class members, but also would inure for the benefit of the public at large.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Nicki Apaydin, individually and on behalf of all others

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

similarly situated, respectfully requests that this Court enter judgment against Defendant Rover Group, Inc. and in favor of Plaintiff and the Class, and grant the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

B.    Declare that Defendant's actions, as described herein, violate: (i) CIPA §§ 631 and 632; (ii) CCPA §§ 1798.100(a), (b), (c), and 1798.150; (iii) UCL, Cal. Bus. & Prof. Code §17200 *et seq.*; (iv) the implied contract between Defendant and Class members; and (v) WCPA, RCW 19.86, *et seq*.

C.    Award injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class, including: (i) an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein; (ii) an order requiring Defendant to implement proper notice and consent mechanisms before using the Tracking Technologies; (iii) an order requiring Defendant to destroy all data collected through unlawful monitoring practices; (iv). an order requiring Defendant to comply with all CCPA notice and disclosure requirements; (v) an order requiring Defendant to implement and maintain reasonable security procedures for personal information; (vi) an order requiring Defendant to honor its contractual promises regarding user privacy;

D.    Award statutory damages to Plaintiff and the California Subclass as follows: (i) $5,000 for each violation of Cal. Penal Code § 631; (ii) $5,000 for each violation of Cal. Penal Code § 632; (iii) Statutory damages of not less than $100 and not more than $750 per consumer per incident under Cal. Civ. Code § 1798.150(a)(1)(A), or actual damages, whichever is greater, and actual damages, treble damages, attorneys' fees under RCW 19.86.090, and all other available relief

-47-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

E.    Award compensatory damages for breach of implied contract, including but not limited to: (i) Loss of the benefit of the bargain; (ii) Diminution in value of personal information; (iii) Consequential damages from unauthorized data disclosure;

F.    Award restitution and disgorgement of Defendant's unjust enrichment, including all revenue and benefits derived from: (i) The unauthorized collection and monetization of user data; (ii) Enhanced advertising revenue from Tracking Technologies; (iii) Avoided costs of obtaining proper consent; (iv) The commercial value of user behavioral profiles;

G.    Award punitive damages to the extent permitted by law for Defendant's willful and malicious violations of users' privacy rights;

H.    Declare that Rover's Terms' dispute resolution provisions and limitations on liability and types of relief are unenforceable;

I.    Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees pursuant to: (i) Cal. Penal Code § 637.2(a); (ii) Cal. Civ. Code § 1798.150(a)(1)(C); (iii) California Code of Civil Procedure § 1021.5; (iv) Cal. Bus & Prof. Code §17203; (v) RCW 19.86.090, and all other available relief, and (vi) Any other applicable fee-shifting provisions;

J.    Award Plaintiff and the Class pre- and post-judgment interest to the extent allowable by law;

K.    Order an accounting of all data collected from Class members and all revenues derived therefrom;

L.    Award such other and further relief as equity and justice may require.

-48-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury for all issues so triable.

Dated: April 21, 2026                    Respectfully Submitted,

By: */s/ Victor J. Sandoval*
    Victor J. Sandoval (SBN 344461)
    **ALMEIDA LAW GROUP LLC**
    3415 S. Sepulveda Blvd., Suite 1121
    Los Angeles, California 90034
    (562) 534-5907
    victor@almeidalawgroup.com

    Raphael Janove (SBN 361193)
    **JANOVE PLLC**
    115 Broadway, 5th Fl.
    New York, NY 10006
    (646) 347-3940
    raphael@janove.law

    *Attorneys for Plaintiff & the Putative Classes*

-49-

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL