Michael D. Meuti (CA 227939)
Benesch, Friedlander, Coplan & Aronoff LLP
100 Pine Street, Suite 3100
San Francisco, California 94111
Telephone:628.600.2250
Facsimile: 628.221.5828
mmeuti@beneschlaw.com

Attorneys for Defendant
A Place for Rover, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NICKI APAYDIN, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>ROVER GROUP, INC.,<br><br>Defendant. | Case No. 2:26-cv-4215-FLA-DMK<br><br>**A PLACE FOR ROVER, INC'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION**<br><br>Date: August 21, 2026<br>Time: 1:30 p.m.<br>Courtroom: 6B<br><br>Complaint Filed: April 21, 2026 |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on August 21, 2026 at 1:30 p.m. or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Judge Fernando L. Aenlle-Rocha, Courtroom 6B, 6th Floor, Felicitas and Gonzalo Mendez United States Courthouse, 350 W 1st Street, Suite 4311 Los Angeles, CA 90012, Defendant A Place for Rover, Inc. ("Rover") will and hereby does move this Court for an order compelling Plaintiff to arbitrate her claims on an individual basis and staying this action pending completion of arbitration. If the Court declines to compel arbitration, Rover alternatively requests transfer of this action to the United States District Court for the Western District of Washington pursuant to the parties' forum-selection agreement.

Rover seeks to compel arbitration because:

1. Plaintiff agreed to Terms of Service, which require individual arbitration and prohibit classwide proceedings.

2. By filing this putative class action, Plaintiff breached her agreement to resolve any claims or disputes through individual arbitration.

3. Plaintiff and Rover delegated arbitrability questions to the arbitrator. As a result, this Court need not reach any objections as to the validity and scope of the arbitration agreement.

4. Even if the Court reaches arbitrability issues, the arbitration agreement is enforceable and encompasses all of Plaintiff's claims.

5. Rover provided conspicuous notice of the Terms of Service and a meaningful opportunity to opt out of arbitration, but Plaintiff signed up for Rover's services, freely accepted the Terms, and used Rover's online marketplace anyway.

The Court should compel arbitration through the Judicial Arbitration and Mediation Services ("JAMS"), stay this action pending completion of arbitration, and enforce the parties' agreement according to its terms. But if the Court declines

to compel arbitration, it should transfer this matter to the Western District of Washington consistent with the parties' forum-selection clause.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on July 9, 2026.

This Motion is based on this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of Jacob Friedmann; matters subject to judicial notice; the pleadings and papers filed in this action; and such further written or oral argument as may be presented at or before the time this Court takes the Motion under advisement.

Dated: July 24, 2026

Respectfully submitted,

*/s/ Michael D. Meuti*
MICHAEL D. MEUTI (CA 227939)
Benesch, Friedlander, Coplan & Aronoff LLP

Attorneys for Defendant
A Place for Rover, Inc.

# TABLE OF CONTENTS

Page


I. INTRODUCTION ..... 1
II. LEGAL STANDARD ..... 2
III. STATEMENT OF FACTS ..... 3
- A. Rover's online marketplace. ..... 3
- B. Apaydin agreed to arbitrate her claims. ..... 3
- C. Apaydin refused to arbitrate by bringing this suit. ..... 6

IV. ARGUMENT: THE ARBITRATION AGREEMENT IS VALID AND ENFORCEABLE ..... 7
- A. The FAA requires the Court to enforce the parties' arbitration agreement. ..... 7
- B. Apaydin agreed to arbitrate all claims related to Rover's online marketplace. ..... 8
  - 1. Apaydin cannot deny that Rover provided conspicuous notice of the Terms. ..... 8
  - 2. Apaydin repeatedly manifested her assent to the Terms of Service and arbitration agreement. ..... 9
- C. Apaydin expressly delegated arbitrability questions to the arbitrator. ..... 11

V. EVEN IF THE COURT ADDRESSES ARBITRABILITY, THE AGREEMENT IS ENFORCEABLE AND ENCOMPASSES PLAINTIFF'S CLAIMS ..... 13
- A. Even if the Court addresses the arbitration agreement's scope, Apaydin's claims plainly fall within the arbitration agreement. ..... 13
- B. Even if the Court entertained Apaydin's unconscionability arguments, they fail. ..... 14
  - 1. Apaydin cannot prove procedural unconscionability. ..... 15
  - 2. Apaydin cannot establish substantive unconscionability. ..... 16

VI. IF THE COURT DECLINES TO COMPEL ARBITRATION, IT SHOULD TRANSFER THIS ACTION TO THE WESTERN DISTRICT OF WASHINGTON ........ 17

A. Apaydin agreed to a valid and enforceable Washington forum-selection clause ........ 17

B. The Section 1404(a) factors favor transfer to Washington. ........ 19

VII. CONCLUSION ........ 20

# TABLE OF AUTHORITIES


Page(s)

**Cases**

*Adam v. CaringBridge, Inc.*, No. 25-CV-06042-WHO, 2025 WL 3493565 (N.D. Cal. Dec. 5, 2025) ....... 19

*Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 103 P.3d 773 (2004) ....... 15, 16

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ....... 2, 16, 17

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63–64 (2013) ....... 17, 18

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ....... 9

*Bernsley v. Barclays Bank Del.*, 657 F. Supp. 3d 1327 (C.D. Cal. 2023) ....... 8

*Bielski v. Coinbase, Inc.*, 87 F.4th 1003 (9th Cir. 2023) ....... 2

*Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015) ....... 7

*Britton v. Co-op Banking Grp.*, 4 F.3d 742 (9th Cir. 1993) ....... 14

*Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1156 (9th Cir. 2025) ....... 9

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000) ....... 2, 7, 14

*Christian v. Pressed Juicery, Inc.*, 2021 WL 4771801 (C.D. Cal. Apr. 23, 2021) ....... 9

*Cole v. Quest Diagnostics, Inc.*,
No. 1:22-CV-00892-JLT-SKO, 2023 WL 6201702 (E.D. Cal. Sept. 22, 2023) ........ 18

*Comedy Club, Inc. v. Improv W. Assocs.*,
553 F.3d 1277 (9th Cir. 2009) ........ 2

*Cordas v. Uber Techs., Inc.*,
228 F. Supp. 3d 985 (N.D. Cal. 2017) ........ 9

*Davis v. Nordstrom, Inc.*,
755 F.3d 1089 (9th Cir. 2014) ........ 2

*Dean Witter Reynolds Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 7

*Doe v. X Corp.*,
No. 25-CV-07597-TLT, 2025 WL 3500543 (N.D. Cal. Nov. 6, 2025) ........ 20

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482, 484 (9th Cir. 2020) ........ 9

*Ford V. Hyundai Motor Am.*,
No. 8:20-CV-00890-FLA-ADS, 2021 WL 7448507, at *9 (C.D. Cal. Oct. 5, 2021) ........ 12

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ........ 10

*Henderson v. Samuel, Son & Co. USA Inc.*,
No. 5:24-cv-00595-MWC-SHK, 2025 WL 1681816 (C.D. Cal. Feb. 4, 2025) ........ 17

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) ........ 7, 11, 13

*Hong Kong Cont'l Trade Co. Ltd. v. Nat. Balance Pet Foods, Inc.*,
No. 2:22-cv-00571-JAK-AFM, 2023 WL 2664246 (C.D. Cal. Mar. 28, 2023) ........ 12

*Howsam v. Dean Witter Reynolds, Inc.*,
537 U.S. 79 (2002) ........ 11

*Joel Bauer & Assocs. v. Hawkins*,
2019 WL 4238885 (C.D. Cal. Mar. 25, 2019) .................................................. 11

*Johnmohammadi v. Bloomingdale's, Inc.*,
755 F.3d 1072 (9th Cir. 2014) ................................................................ 16

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) ............................................................. 7, 8

*Kilgore v. KeyBank, Nat. Ass'n*,
718 F.3d 1052 (9th Cir. 2013) ................................................................ 16

*KMS, LLC v. Major League Trucking, Inc.*,
No. 2:22-CV-06245, 2023 WL 5333784 (C.D. Cal. July 25, 2023) ........... 17, 18

*Lee v. DoNotPay, Inc.*,
683 F. Supp. 3d 1062 (C.D. Cal. 2023) ................................................... 15

*Marshall v. Hipcamp Inc.*,
735 F. Supp. 3d 1283 (W.D. Wash. 2024) ............................................... 16

*Martinez v. BaronHR, Inc.*,
51 Cal. App. 5th 962 (2020) ................................................................... 14

*Meyer v. T-Mobile USA Inc.*,
836 F. Supp. 2d 994 (N.D. Cal. 2011) ..................................................... 16

*U.S. ex rel. Modglin v. DJO Glob. Inc.*,
48 F. Supp. 3d 1362 (C.D. Cal. 2014), *aff'd* .......................................... 19

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ................................................................................ 2, 13

*Nelson v. McGoldrick*,
127 Wash. 2d 124, 896 P.2d 1258 (1995) ............................................... 16

*Oberstein v. Live Nation Ent., Inc.*,
60 F.4th 505 (9th Cir. 2023) ................................................................ 8, 9

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
724 F.3d 1069 (9th Cir. 2013) ................................................................ 12

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) .................................................................. 12

*Rendon v. T-Mobile USA, Inc.*,
747 F. Supp. 3d 1314 (C.D. Cal. 2024) .......... 10

*Rent-A-Center, West, Inc. v. Jackson*,
561 U.S. 63 (2010) .......... 11, 13

*Ronderos v. USF Reddaway, Inc.*,
114 F.4th 1080 (9th Cir. 2024) .......... 16

*Sandquist v. Lebo Automotive, Inc.*,
1 Cal.5th 233 (2016) .......... 11

*Shearson/Am. Exp., Inc. v. McMahon*,
482 U.S. 220, 226 (1987) .......... 7

*Showalter v. Apartment Mgmt. Consultants LLC*,
754 F. Supp. 3d 1074 (W.D. Wash. 2024) .......... 12

*Smith v. Spizzirri*,
601 U.S. 472 (2024) .......... 20

*So v. Hyatt Corp.*,
No. 2:25-CV-1298-AB-SSC, 2025 WL 2994995 (C.D. Cal. Aug. 25, 2025) .......... 18

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) .......... 10

*Thomas v. Wells Fargo Dealer Servs.*,
No. 2:13-cv-05168-RGK-PJW, 2013 WL 12114768 (C.D. Cal. Oct. 1, 2013) .......... 14

*Tompkins v. 23andMe, Inc.*,
840 F.3d 1016 (9th Cir. 2016) .......... 14

*United States v. DJO Glob., Inc.*,
678 F. App'x 594 (9th Cir. 2017) .......... 20

*Wolfire Games, LLC v. Valve Corp.*,
No. C21-0563-JCC, 2021 WL 4952220 (W.D. Wash. Oct. 25, 2021) .......... 12

*Yei A. Sun v. Advanced China Healthcare, Inc.*,
901 F.3d 1081 (9th Cir. 2018) .......... 17, 18

**Statutes**

9 U.S.C. § 2 .......... 2

9 U.S.C. § 3 .......... 7

9 U.S.C. § 4 .......... 2

28 U.S.C. § 1404(a) .......... 17

**Rules**

JAMS Rule 8(b) .......... 12

## I. INTRODUCTION

Plaintiff Nicki Apaydin agreed to Rover's Terms of Service not once, but multiple times over several years. She first accepted the Terms of Service when she signed up for a Rover account on March 15, 2022. She later accepted updated versions of the Terms on at least four separate occasions through 2025. Each version of the Terms of Service contained an arbitration agreement, requiring individual arbitration of claims or disputes arising from her use of Rover, and delegated threshold arbitrability questions to the arbitrator. After creating her account, Apaydin used Rover's online marketplace multiple times to arrange care for her dog.

Despite repeatedly agreeing to arbitrate and continuing to use Rover, Apaydin filed this putative class action in federal court. She alleges that Rover collected and disclosed users' internet browsing data, location data, and personal identifiers to third parties without consent. Based on those allegations, Apaydin asserts statutory and common-law claims on behalf of herself and a putative class. The nonviability of those allegations is not before the Court for adjudication. This Motion asks only that Apaydin be held to the dispute-resolution process that she repeatedly accepted for claims arising from her use of Rover's services. The arbitration agreement in the Terms of Service is valid and binding.

Further, Apaydin agreed to delegate all questions about arbitrability to the arbitrator. Because the parties delegated arbitrability, this Court need not address any potential objections regarding validity, enforceability, or scope of the arbitration agreement. The same Terms of Service containing the arbitration and delegation provisions also require that claims not subject to arbitration be brought exclusively in Washington courts. Accordingly, the Court should compel arbitration and stay this action, or if it declines to enforce the arbitration agreement, transfer this matter to the Western District of Washington pursuant to the parties' forum-selection agreement.

## II. LEGAL STANDARD

Arbitration is fundamentally a matter of contract. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The Federal Arbitration Act ("FAA") reflects a liberal federal policy favoring arbitration. *Concepcion*, 563 U.S. at 339. It makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. Courts must "place arbitration agreements on equal footing with other contracts, and enforce them according to their terms." *Concepcion*, 563 U.S. at 339.

The FAA requires courts to compel arbitration when the parties agreed to arbitrate the dispute at issue. When a party to an arbitration agreement (here, Apaydin) "fail[s], neglect[s], or refus[es]" to arbitrate, the FAA empowers the other party (here, Rover), to "petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Court's role is limited to determining: (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). In California, a "clear agreement" to arbitrate may be either express or implied in fact. *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014).

What is more, courts have long recognized a presumption of arbitrability requiring them to direct parties to arbitrate when the contract contains an arbitration clause. *Comedy Club, Inc. v. Improv W. Assocs.*, 553 F.3d 1277, 1284 (9th Cir. 2009). Any doubts about the scope of arbitrable issues must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Finally, the party opposing arbitration bears the burden of proving by a preponderance of evidence any defense, such as unconscionability. *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1013 (9th Cir. 2023).

## III. STATEMENT OF FACTS

### A. Rover's online marketplace.

Rover is an online marketplace where pet lovers can find or offer neighborhood pet care for dogs and cats. *See* Declaration of Jacob Friedmann ("Friedmann Decl.") Its website and mobile app allow people who wish to offer pet care to create a profile to advertise their independent pet care services (such as pet boarding, dog walking, or drop-in visits), while pet owners can browse the directory of profiles based on their pet's needs. (Friedmann Decl., ¶ 3.) If a pet owner finds someone who they think might be a good fit, they can reach out and communicate directly with the provider to ask questions, arrange specifics, and mutually decide whether to move forward with a booking. (*Id.*)

### B. Apaydin agreed to arbitrate her claims.

On March 15, 2022, Apaydin signed up for a Rover account on her iOS mobile device. (*Id.* ¶ 6.) At the initial sign-up page, Rover presented Apaydin with a "Sign Up for Rover" screen. (*Id.* Ex. A.) It offered the option to create an account either using Facebook, Google, Apple, or by email. (*Id.* ¶¶ 5–6.) Rover required assent to the Terms of Service before an account could be created. (*Id.* ¶ 7.)

Business records confirm that Apaydin chose to sign up with email. (*Id.* ¶ 6.) She did so by entering her name and email, creating a password, and then clicking on the "Sign Up" button. (*Id.*) Immediately above this action button, Apaydin was informed that: "By signing up, I agree to the Terms of Service and Privacy Statement, confirm that I am 18 years of age or older, and consent to receiving email communication." (*Id.* ¶ 6, Ex. A (emphasis in original).) The words in blue font contained hyperlinks to the referenced Terms of Service, allowing Apaydin to easily review them before deciding whether to agree and sign up. (*Id.* ¶ 6.)

After completing the sign-up process and creating her account, Apaydin used the online marketplace to arrange pet care bookings for her dog in 2022, 2023, 2024,

and 2025. (*Id.* ¶ 8.) Apaydin could not have created a Rover account, nor used her account to connect with pet care providers, without *first* clicking to agree to the Terms of Service. (*Id.* ¶ 5–6.) The Terms of Service govern all use of Rover's online marketplace. (*Id.*, Ex. B § 1, Ex. D § 1.)

In addition to agreeing to Rover's Terms of Service in March 2022, Apaydin repeatedly accepted updated versions of the Terms, including the current Terms of Service effective as of March 27, 2025. (Friedmann Decl., ¶¶ 9–10 (showing that Apaydin accepted updated Terms, which include the arbitration agreement, on at least *four* different occasions between 2023–2025).) Most recently, when visiting Rover for the first time after March 27, 2025, users were presented with a pop-up screen notifying them that Rover had updated the Terms of Service and requiring them to review and agree to the updated Terms. (*Id.* ¶ 11.) To continue on Rover's online marketplace, users were required to click the "Agree" button directly below the notice stating: "By clicking the Agree button, I acknowledge that I have reviewed and agree to Rover.com's Terms of Service." (*Id.*) The phrase in blue font contained a hyperlink that, when clicked, directed the user to a copy of the updated Terms of Service. (*Id.*) Business records show that Ms. Apaydin clicked on the "Agree" button and accepted the updated Terms of Service on April 5, 2025. (*Id.* ¶ 12.) She could not have proceeded past this pop-up screen to continue using Rover without agreeing to the updated Terms of Service. (*Id.*)

Section 17 of the Terms of Service, which contains the arbitration agreement, states:

> **PLEASE READ THIS SECTION CAREFULLY, AS IT PRESCRIBES HOW DISPUTES BETWEEN US WILL BE RESOLVED.**
>
> …
>
> Agreement to Arbitrate. Unless you opt out of the Arbitration Agreement in accordance with the procedure described in Section 17.9 below, **you and Rover agree that any and all Claims** (other than

> Excluded Claims) **will be resolved exclusively on an individual basis through final and binding arbitration, rather than in a court** [ ] in accordance with this Arbitration Agreement, and your rights in connection with all Claims (other than Excluded Claims) **will be determined by a neutral arbitrator, not by a judge or jury**.

(*Id*., Ex. D § 17–17.2 (emphasis added).) The Terms of Service define "Claims" to mean "any and all disputes or claims that arise between you and Rover relating to the Rover Service, interactions with others on the Rover Service, or these Terms (including any alleged breach of these Terms) [ ] except for Excluded Claims."[1] (*Id*. § 17.1.) The Terms of Service do not exclude Apaydin's claims.

The arbitration agreement also explicitly, in bold capitalized font states that the parties agreed, to the fullest extent permitted by law, to bring claims "**ONLY ON AN INDIVIDUAL BASIS AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION OR PROCEEDING** …" (*Id*. § 17.3 (emphasis in original).) The Terms of Service add that if any term or provision under Section 17 is deemed invalid or unenforceable, it will only be so "to the minimum extent required by law, and all other terms, clauses and provisions of this Section 17 will remain valid and enforceable." (*Id*. § 17.8.)

Under the arbitration agreement, Apaydin also agreed that the FAA governs interpretation and enforcement. (*Id*. § 17.2.) She agreed that arbitration will occur in accordance with JAMS Arbitration Rules and Procedures ("JAMS Rules"). (*Id*. § 17.5.) The agreement directly hyperlinks the JAMS Rules. (*Id*.)

---

[1] The arbitration provision under Section 17.1 excludes: (1) certain individual claims brought in small claims court; (2) claims arising out of or related to violations under Section 4.1 (listing prohibited conduct, e.g., arranging care for exotic, dangerous, or non-domesticated animals); (3) claims in which either party seeks injunctive or other equitable relief for the alleged unlawful use of intellectual property (e.g., copyrights, trademarks, trade names, logos, trade secrets or patents); and (4) claims that cannot be made subject to arbitration under applicable law.

Finally, the arbitration agreement exclusively reserves questions of arbitrability for the arbitrator:

> As limited by applicable law, these Terms and the applicable Rules, **the arbitrator will have (1) the exclusive authority and jurisdiction** to make all procedural and substantive decisions regarding a Claim, including the determination of whether a Claim is arbitrable, and (2) the authority to grant any remedy that would otherwise be available in court.

(*Id*. § 17.5 (emphasis added).)

**C. Apaydin refused to arbitrate by bringing this suit.**

On April 21, 2026, Apaydin filed this putative class action alleging multiple violations under California's Invasion of Privacy Act ("CIPA"), California Consumer Privacy Act, California's Unfair Competition Law, the Washington Consumer Protection Act, as well as breach of implied contract, unjust enrichment, and seeking declaratory relief. (Compl. ¶¶ 116–249.)

Apaydin claims that she created an account and used the Rover App on her mobile device to reserve pet-sitting services. (*Id*. ¶¶ 68–77.) She alleges that Rover "intercepted" personal information, tracked her browsing activity, and disclosed that information to third-party advertising and analytics companies without her consent. (*Id*. ¶¶ 76–79.) She also rejects arbitration, alleging that the Terms of Service are unilaterally unconscionable. (*Id*. ¶¶ 80–82.) Although Apaydin clicked to sign up for Rover services governed by the Terms of Service, she objects to the Terms, including the arbitration agreement under Section 17. (*Id*. ¶¶ 83–101 (alleging that neither Apaydin nor the putative class are subject to arbitration, class waiver is invalid, and the dispute resolution provisions are unconscionable).)

Even though she accepted the Terms of Service and its arbitration clause multiple times, Apaydin seeks to litigate the claims that she agreed to arbitrate. She has thus refused to arbitrate.

## IV. ARGUMENT: THE ARBITRATION AGREEMENT IS VALID AND ENFORCEABLE

### A. The FAA requires the Court to enforce the parties' arbitration agreement.

The FAA requires courts to compel arbitration of claims covered by an enforceable agreement. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013 (9th Cir. 2024) (citing 9 U.S.C. § 3). The Supreme Court requires courts to "rigorously" enforce arbitration agreements. *Shearson/Am. Exp., Inc. v. McMahon,* 482 U.S. 220, 226 (1987). The Court's role on a motion to compel arbitration is thus limited. It simply asks: (1) does a valid agreement to arbitrate exist, and (2) does the dispute fall within the scope of the agreement? *Chiron Corp.*, 207 F.3d at 1130. When both requirements are satisfied, the FAA "leaves no place for the exercise of discretion," but mandates courts to direct the parties to arbitration according to their agreement. *Id*. (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985)).

Here, the Court's role is especially limited because Apaydin agreed to delegate "gateway" arbitrability questions to the arbitrator. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). When parties clearly and unmistakably delegated arbitrability, courts may not decide that issue. *Henry Schein, Inc. v. Archer & White Sales, Inc*., 586 U.S. 63, 69 (2019). Instead, courts must enforce the agreement and compel arbitration. *Id.*

That's precisely the appropriate application in this case. Apaydin repeatedly accepted Rover's Terms of Service, which contain a valid arbitration agreement. (Friedmann Decl., ¶¶ 7, 9–10.) Because her principal objection is that the arbitration agreement is unconscionable, the threshold question is who decides that issue. The delegation provision in the Terms of Service answers that question: the arbitrator does. The Court should therefore compel arbitration.

### B. Apaydin agreed to arbitrate all claims related to Rover's online marketplace.

The parties formed an enforceable arbitration agreement. Under California law, contract formation requires reasonably conspicuous notice of the terms and unambiguous manifestation of assent by the parties. *Keebaugh*, 100 F.4th at 1013–14 (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023)). Both requirements are present here. Apaydin received conspicuous notice of the Terms of Service and manifested her assent to them. Thus, Rover has established that a valid arbitration agreement exists. And the burden now shifts to Apaydin to prove its unenforceability. *See Bernsley v. Barclays Bank Del.*, 657 F. Supp. 3d 1327, 1333 (C.D. Cal. 2023).

#### ***1. Apaydin cannot deny that Rover provided conspicuous notice of the Terms.***

Rover's sign-up screen provided conspicuous notice under controlling Ninth Circuit law. Before creating an account, Apaydin encountered a registration page explaining that "signing up" constituted agreement to Rover.com's Terms of Service and Privacy Statement. (Friedmann Decl., Ex. A (emphasis in original).) The notice appeared directly above the "Sign Up" action button used to complete registration. (*Id.*) Further, the Terms of Service appeared as a clearly identified blue hyperlink immediately above the action button. (*Id.*) Apaydin had every opportunity to review the Terms before creating her account.

Apaydin cannot credibly contest that notice. To sign up with email, Rover required assent to the Terms of Service at the onset. Apaydin could not create an account without proceeding through a registration process that disclosed the existence of the governing Terms.

That design satisfies Ninth Circuit standards for inquiry notice. Courts routinely enforce online agreements when users receive notice that registering

signifies assent, and when hyperlinked terms appear near the action button. In *Oberstein*, the Ninth Circuit held that notice was sufficient when the hyperlink appeared "directly above" the action button used to complete a transaction and was "distinguished from the surrounding text in bright blue font, making its presence readily apparent." 60 F.4th at 516. The Ninth Circuit applied the same principle in *Chabolla v. ClassPass Inc.*, explaining that blue hyperlinked terms placed above the action button satisfy reasonably conspicuous inquiry notice. 129 F.4th 1147, 1156 (9th Cir. 2025) (citing *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 857 (9th Cir. 2022)). And in *Dohrmann v. Intuit, Inc.*, the court held that the notice was conspicuous when the terms appeared immediately near a sign-in button on an otherwise uncluttered page. 823 F. App'x 482, 484 (9th Cir. 2020). Rover's interface used those same features. Apaydin therefore received conspicuous notice of the Terms of Service as a matter of law.

**2. *Apaydin repeatedly manifested her assent to the Terms of Service and arbitration agreement.***

Apaydin affirmatively manifested her assent to the Terms of Service by signing up with Rover and continuing to use the online marketplace. After receiving notice that clicking and signing up constituted an agreement to the Terms, she chose to create an account and arranged pet care through the online marketplace. (Compl. ¶ 68; Friedmann Decl., ¶ 7–8.) Conduct showing that a consumer accepts the contract suffices to manifest their assent. *Christian v. Pressed Juicery, Inc.*, 2021 WL 4771801, at *3 (C.D. Cal. Apr. 23, 2021).

Apaydin could not have completed the registration process or used Rover's online marketplace without first accepting the governing Terms of Service. (Friedmann Decl., ¶ 7.) She was free to reject the Terms of Service but chose otherwise. (*Id.* ¶¶ 7–8, 9–10; *id.*, Ex. D § 17.9); *see also Cordas v. Uber Techs., Inc.,* 228 F. Supp. 3d 985, 988–90 (N.D. Cal. 2017) (concluding that the plaintiff

manifested assent to the arbitration agreement by clicking "DONE" to complete the sign-up process on a page displaying a notice that "[b]y creating an Uber account, you agree to the Terms & Conditions," which were hyperlinked).

Apaydin assented again after she first created her account. Business records establish that Apaydin repeatedly accepted updated versions of the Terms of Service while continuing to use Rover, including the currently effective March 2025 Terms. (Friedmann Decl. ¶¶ 9–10, Ex. C–D.) Rover informed users of the updated March 2025 Terms of Service through a pop-up screen that required them to click "Agree" before continuing to access the online marketplace. (*Id.* ¶ 11.) Apaydin could not proceed past that pop-up screen to use Rover without assenting to the updated Terms. (*Id.*) She accepted the Terms of Service, including the arbitration agreement at least four times between 2023 and 2025. (*Id.* ¶ 9.)

Each acceptance independently manifested assent to the arbitration agreement. *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 933 (N.D. Cal. 2024) (plaintiff assented by agreeing to the terms combined with his continued use of the services). In every instance, Apaydin had an opportunity to review and reject the terms. Yet she chose to accept them each time and continued using Rover's online marketplace. *See Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911–12 (N.D. Cal. 2011) (a binding contract was created because plaintiff could review the terms of service and she admittedly clicked "Accept").

Rover's updated Terms of Service also independently bind Apaydin. The Terms expressly advised users that "continued access and use of the Rover Service after we post the modified Terms will constitute your consent to be bound by the modified Terms." (Friedmann Decl., Ex. D § 1.) Courts routinely hold that continued use of a service after receiving notice of modified or updated terms constitutes acceptance of those terms. *Rendon v. T-Mobile USA, Inc.*, 747 F. Supp. 3d 1314, 1320–21 (C.D. Cal. 2024) (ordering individual arbitration). Apaydin's

actions, her continued use of Rover's online marketplace after receiving updated notices, and repeatedly accepting the Terms of Service independently show binding assent to the arbitration agreement. *Joel Bauer & Assocs. v. Hawkins*, 2019 WL 4238885, at *2 (C.D. Cal. Mar. 25, 2019) (plaintiff consented by further using the services after modification of terms).

Rover easily satisfies the conspicuous notice and assent elements required for contract formation. The arbitration agreement is therefore valid and enforceable.

### C. Apaydin expressly delegated arbitrability questions to the arbitrator.

The Court need not decide challenges to the arbitration agreement's validity or scope because the parties expressly delegated arbitrability issues. The Supreme Court establishes that parties can agree to delegate gateway questions of arbitrability—e.g., whether they agreed to arbitrate or whether a particular dispute falls within the scope of an arbitration agreement—to the arbitrator. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010). Courts must enforce those agreements when delegation is clear and unmistakable. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *Sandquist v. Lebo Automotive, Inc.*, 1 Cal.5th 233, 251 (2016).

Here, the parties' agreement delegates arbitrability in two independent ways. First, the agreement's plain language expressly grants the arbitrator "*exclusive authority and jurisdiction* to make all procedural and substantive decisions regarding a Claim, *including* the determination of whether a Claim is arbitrable." (Friedmann Decl., Ex. D § 17.5 (emphasis added).) Once a party establishes the existence of an agreement containing a "clear and unmistakable" delegation—as Rover has done here—the Court "possesses no power to decide the arbitrability issue" and must compel arbitration. *Henry Schein*, 586 U.S. at 68.

Second, the agreement requires arbitration under the JAMS Rules, and those rules delegate arbitrability questions to the arbitrator. (Friedmann Decl., Ex. D § 17.5.) They expressly authorize the arbitrator to determine issues concerning formation, validity, interpretation, and scope "as a preliminary matter."[2] "Virtually every circuit" has determined that incorporating such rules is additional evidence of the parties' clear intent to delegate arbitrability. *Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 480 (9th Cir. 2024); *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) (collecting cases). This Court agrees. In *Ford v. Hyundai Motor Am.*, it concluded that incorporating the JAMS Rules by reference is clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability to an arbitrator. No. 8:20-CV-00890-FLA-ADS, 2021 WL 7448507, at *9 (C.D. Cal. Oct. 5, 2021) (Aenlle-Rocha, J.) (granting defendants' motion to compel arbitration).

Because the parties delegated the issue of arbitrability, this Court's inquiry largely ends there. To the extent Apaydin raises hypothetical challenges about scope, enforceability, or application to particular claims, all of those arguments belong before the arbitrator. That includes unconscionability challenges, which courts have recognized as threshold arbitrability issues subject to delegation. See *Showalter v. Apartment Mgmt. Consultants LLC*, 754 F. Supp. 3d 1074, 1079 (W.D. Wash. 2024) (granting defendants' motion to compel arbitration and noting that arbitrable threshold issues may include whether the arbitration agreement is unconscionable); *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2021 WL

---

[2] *See* JAMS Rule 8(b), available at: https://www.jamsadr.com/rules-streamlined-arbitration#Rule-8. (Last accessed June 28, 2026). Because arbitration rules are from a source whose accuracy cannot reasonably be disputed, this Court has recognized them as a proper subject of judicial notice. See *Hong Kong Cont'l Trade Co. Ltd. v. Nat. Balance Pet Foods, Inc.*, No. 2:22-cv-00571-JAK-AFM, 2023 WL 2664246, at *3 (C.D. Cal. Mar. 28, 2023)

4952220, at *2 (W.D. Wash. Oct. 25, 2021) (the question of unconscionability should be determined in arbitration).

Accordingly, this Court should compel arbitration and leave any remaining disputes there.

**V. EVEN IF THE COURT ADDRESSES ARBITRABILITY, THE AGREEMENT IS ENFORCEABLE AND ENCOMPASSES PLAINTIFF'S CLAIMS**

The parties delegated questions about the arbitration agreement's enforceability and scope to the arbitrator. Under *Rent-A-Ctr., W., Inc.* and *Henry Schein, Inc*., this Court should enforce that delegation and should not reach those issues. 561 U.S. at 69; 586 U.S. at 69. But even if the Court were inclined to consider them, the result would be the same: Apaydin's claims fall squarely within the arbitration agreement, and she cannot establish any defense to enforcement.

**A. Even if the Court addresses the arbitration agreement's scope, Apaydin's claims plainly fall within the arbitration agreement.**

The arbitration agreement broadly applies to "*any and all disputes or claims*" between Apaydin and Rover regarding Rover's services, interactions with others in the marketplace, and the Terms of Service. (Friedmann Decl., Ex. D § 17.1.) The Supreme Court recognizes that broad arbitration provisions, like the one at issue here, receive expansive application and that any doubts concerning arbitrability must be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp*., 460 U.S. at 24–25.

The Terms of Service define Rover's services as the use of its "software applications, resources, and services" to arrange for the provision of pet care services. (Friedmann Decl., Ex. D § 1.) Apaydin alleges that she entered her personal information, browsed Rover's services, and booked pet care through its marketplace. (Compl. ¶¶ 68–75.) Her claims that Rover allegedly collected, tracked, and disclosed her personal information (*id*. ¶¶ 4, 79), therefore arise from

Apaydin's relationship and her interactions with Rover. Nothing in the Complaint identifies conduct occurring outside the parties' contractual relationship or outside the scope of the Terms of Service. To the contrary, Apaydin's claims entirely depend on her use of the online marketplace that the Terms of Service govern. "[A]ny and all disputes or claims" is expansive language that leaves little room for doubt about what the agreement covers. See *Chiron Corp*., 207 F.3d at 1131 ("Any dispute, controversy or claim" is broad and far reaching).[3]

Apaydin's claims therefore fall within the arbitration agreement's broad definition of covered claims. (Friedmann Decl., Ex. D § 17.1); *Thomas v. Wells Fargo Dealer Servs*., No. 2:13-cv-05168-RGK-PJW, 2013 WL 12114768, at *1–2 (C.D. Cal. Oct. 1, 2013) (granting defendant's motion to compel arbitration and finding that plaintiff's consumer and privacy claims fell within the scope of the arbitration clause).

**B. Even if the Court entertained Apaydin's unconscionability arguments, they fail.**

The parties delegated arbitrability and this Court need not resolve any challenges to the arbitration agreement's enforceability. If the Court addresses those objections, however, Apaydin still cannot establish either procedural or substantive unconscionability.

To invoke the unconscionability defense to a contract, courts generally examine both procedural and substantive unconscionability. *Tompkins v. 23andMe, Inc*., 840 F.3d 1016, 1023 (9th Cir. 2016). Washington supplies the relevant

---

[3] *See also Britton v. Co-op Banking Grp*., 4 F.3d 742, 745 (9th Cir. 1993) (noting that parties routinely use broad language in an arbitration clause "to secure the broadest possible arbitration coverage"); *Martinez v. BaronHR, Inc*., 51 Cal. App. 5th 962, 967 (2020) (explicit language evidencing the parties' intent to arbitrate "all disputes," including to waive their right to jury trial, established mutual assent to submit to arbitration).

unconscionability standards because the Terms of Service establish that Washington law governs the parties' disputes, except that the FAA governs interpretation and enforcement of the arbitration agreement. (*See* Friedmann Decl., Ex. D § 18.1.)

***1. Apaydin cannot prove procedural unconscionability.***

Procedural unconscionability concerns oppression (e.g., absence of meaningful choice) or surprise (e.g., hidden provisions) in a contract. *Adler v. Fred Lind Manor*, 153 Wash. 2d 331, 347, 103 P.3d 773, 782 (2004). Neither exists here.

Apaydin cannot claim procedural unconscionability. Rover provided conspicuous notice on its sign-up screen that "[b]y signing up," Apaydin was "agree[ing] to the Terms of Service," which were hyperlinked in offset, blue font. And the arbitration agreement was not hidden or obscured. To the contrary, the Terms of Service begin with a bold, capitalized heading to "***PLEASE READ THESE TERMS CAREFULLY. SECTION 17 INCLUDES A BINDING ARBITRATION CLAUSE AND CLASS ACTION WAIVER AND SECTION 19 INCLUDES A CLASS ACTION WAIVER, WHICH AFFECT HOW DISPUTES ARE RESOLVED***." (Friedmann Decl., Ex. D; *id*. § 17.5 (making JAMS Rules directly available through embedded hyperlinks).) That presentation is not procedurally unconscionable. *See Lee v. DoNotPay, Inc*., 683 F. Supp. 3d 1062, 1077 (C.D. Cal. 2023) (arbitration provision was clearly labeled in the Terms of Service and presented with bold text and an isolated title); *see also Marshall v. Hipcamp Inc*., 735 F. Supp. 3d 1283, 1296 (W.D. Wash. 2024) (finding no procedural unconscionability when underlined and colored terms appeared near action button, communicating that clicking the button manifested assent); *id.* at 1292 (Washington's and California's unconscionability analyses are similar).

Apaydin also had the opportunity to opt out of the arbitration agreement up to 30 days after signing up, without affecting her ability to continue using Rover. (Friedmann Decl., Ex. D § 17.9.) Meaningful opt-out rights like this substantially

undermine claims of procedural unconscionability because they render arbitration voluntary, rather than mandatory. *See Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1077 (9th Cir. 2014) (noting that the ability to opt out made arbitration voluntary, and had plaintiff opted out she would be free to pursue a class action); *see also Meyer v. T-Mobile USA Inc*., 836 F. Supp. 2d 994, 1002–03 (N.D. Cal. 2011) (30-day opt-out period was not procedurally unconscionable). Apaydin chose not to exercise this right. (Friedmann Decl., ¶ 13.) Accordingly, she cannot establish procedural unconscionability.

***2. Apaydin cannot establish substantive unconscionability.***

Substantive unconscionability asks whether contractual terms are overly harsh or so one-sided as to "shock the conscience." *Adler*, 153 Wash. 2d at 344; *Nelson v. McGoldrick*, 127 Wash. 2d 124, 131, 896 P.2d 1258, 1262 (1995). The arbitration agreement has no such terms. It preserves Apaydin's ability to pursue the same individual claims she could seek in court. It offers her the choice to arbitrate in the county where she resides. And it does not shorten any statutes of limitations, restrict available remedies, or impose unfair burdens. (Friedmann Decl., Ex. D § 17.5.) The arbitration agreement merely requires that covered claims be resolved individually in arbitration instead of litigation.

The agreement is also bilateral. Both Apaydin and Rover must arbitrate covered claims, and may choose a "*mutually agreed*" location. (*Id*. §§ 17.2, 17.5.) These reciprocal obligations defeat any suggestion that the agreement is impermissibly one-sided. *See Ronderos v. USF Reddaway, Inc*., 114 F.4th 1080, 1094 (9th Cir. 2024) (an agreement is not unconscionable when there is a "modicum of bilaterality").

Nor can the class-action waiver provision show unconscionability under well-settled Supreme Court and Ninth Circuit precedent. *See Concepcion*, 563 U.S. at 352; *Epic Sys. Corp*., 584 U.S. 497, 506 (2018); *see also Kilgore v. KeyBank, Nat.*

*Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (no substantive unconscionability in class action case). Consistent with *Concepcion*, this Court recently upheld the terms of an arbitration agreement, dismissing with prejudice all class allegations because "it is undisputed that the agreement required arbitration solely on an individual basis." *See Henderson v. Samuel, Son & Co. USA Inc.*, No. 5:24-cv-00595-MWC-SHK, 2025 WL 1681816, at *3 (C.D. Cal. Feb. 4, 2025).

Accordingly, even if the Court reaches unconscionability, that defense fails.

## VI. IF THE COURT DECLINES TO COMPEL ARBITRATION, IT SHOULD TRANSFER THIS ACTION TO THE WESTERN DISTRICT OF WASHINGTON

Rover's primary request is that this Court compel arbitration and stay the case until the parties complete that process. The Court need not reach any venue issues because the parties expressly delegated arbitrability. But if the Court declines to compel arbitration, it should enforce the parties' forum-selection clause and transfer this action to the U.S. District Court for the Western District of Washington. Apaydin expressly agreed that claims or disputes not resolved through arbitration would proceed exclusively in Washington courts, and no extraordinary circumstances justify disregarding that agreement.

### A. Apaydin agreed to a valid and enforceable Washington forum-selection clause.

Forum-selection clauses are presumptively valid and ordinarily should be enforced through a transfer of venue. 28 U.S.C. § 1404(a) (a transfer is proper for the convenience of parties and in the interest of justice); *see also KMS, LLC v. Major League Trucking, Inc.*, No. 2:22-CV-06245, 2023 WL 5333784, at *2 (C.D. Cal. July 25, 2023). When parties agree to a valid forum-selection clause, their chosen forum receives controlling weight except in the most exceptional cases. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas,* 571 U.S. 49, 63 (2013); *Yei A. Sun*

*v. Advanced China Healthcare, Inc.,* 901 F.3d 1081, 1091 (9th Cir. 2018) (agreeing to a forum-selection clause waives the right to challenge "the preselected forum as inconvenient"). The party resisting transfer must show that public-interest considerations disfavor enforcement of the clause. *Id.*

Apaydin cannot satisfy that burden here. Section 18 of the Terms of Service provides that "any claim" not resolved through arbitration must proceed "exclusively" in state or federal courts located in Washington. (Friedmann Decl., Ex. D § 18.1.) She agreed to the Terms of Service when she created her account and continued using Rover's online marketplace. Washington is the only forum selected by contract between the parties.

This forum-selection clause is valid prima facie. *See KMS, LLC,* 2023 WL 5333784, at *2. Nothing suggests that enforcing it would be unreasonable or unjust. *See Atl. Marine Const. Co.,* 571 U.S. at 64 (noting that litigating in the contractual forum the parties agreed to "was clearly foreseeable at the time of contracting"). Apaydin voluntarily accepted the Terms of Service, repeatedly used Rover's services, and asserts claims arising directly from the relationship governed by those Terms. What is more, Apaydin also seeks relief under the Washington Consumer Protection Act. (Compl. ¶¶ 224–234.) She cannot dispute enforceability.

Courts regularly enforce forum-selection clauses under similar circumstances. For example, this Court transferred a CIPA class action to the District of Minnesota based on a forum-selection clause "that plaintiff agreed to" "upon creating an account." *Adam v. CaringBridge, Inc.*, No. 25-CV-06042-WHO, 2025 WL 3493565, at *7 (N.D. Cal. Dec. 5, 2025); *see also So v. Hyatt Corp.*, No. 2:25-CV-1298-AB-SSC, 2025 WL 2994995, at *8 (C.D. Cal. Aug. 25, 2025) (transferring CIPA class action to the Northern District of Illinois because plaintiff could not show that enforcement would be unreasonable or unjust); *Cole v. Quest Diagnostics, Inc.*, No. 1:22-CV-00892-JLT-SKO, 2023 WL 6201702, at *5 (E.D. Cal. Sept. 22, 2023)

(transferring CIPA class action because no exceptional circumstances against enforcement existed).

Accordingly, the Court should enforce the forum-selection clause and transfer the case to the U.S. District Court for the Western District of Washington.

**B. The Section 1404(a) factors favor transfer to Washington.**

Because the forum-selection clause in Section 18 is valid and enforceable, the same conclusion follows under Section 1404(a). The parties selected Washington by contract. Rover is also headquartered there. The Terms of Service designated Washington law as governing "without regard to principles of conflicts of law, except that the Federal Arbitration Act will govern the interpretation and enforcement of" the arbitration agreement. (Friedmann Decl., Ex. D § 18.1.) Because Apaydin agreed to litigate non-arbitrable disputes in Washington, she cannot claim unfairness or inconvenience from enforcement of that agreement.

Moreover, no competing public-interest factor overcomes the explicit contractual choice of Washington. If anything, public-interest considerations modestly favor Washington.

Federal caseload statistics show that the Central District of California remains among the busiest district courts in the Ninth Circuit. As of December 31, 2025, 15,494 cases were pending in this District, compared to 5,031 pending cases across Washington's federal district courts combined. *See* 2025 U.S. Caseload Statistics.[4] Per judgeship, this Court carried 553 pending actions, compared to 341 in the

---

[4] *See* https://www.uscourts.gov/sites/default/files/document/fcms_na_distcomparison1231.2025.pdf (United States Courts Caseload Statistics) (last accessed July 6, 2026). The Court can take judicial notice of this public record available on "websites run by governmental agencies." *See U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014), *aff'd* sub nom. *United States v. DJO Glob., Inc.*, 678 F. App'x 594 (9th Cir. 2017)

Eastern District of Washington and 524 in the Western District of Washington. *Id.* Although median time from civil case filings to trial appears relatively comparable between the districts (25.5 months in this District compared to 27 months across Washington's federal courts), the overall caseload data indicates that Washington's federal courts potentially possess greater capacity to manage and resolve this matter. *See Doe v. X Corp.*, No. 25-CV-07597-TLT, 2025 WL 3500543, at *8 (N.D. Cal. Nov. 6, 2025) (considering court-congestion statistics and finding transfer appropriate). To the extent public-interest considerations are relevant, they do not overcome the parties' contractual selection of Washington as the exclusive forum for non-arbitrable disputes.

Accordingly, if the Court declines to compel arbitration, it should transfer this action to the Western District of Washington.

## VII. CONCLUSION

Apaydin repeatedly accepted Rover's Terms of Service, which include a valid arbitration agreement that delegates all gateway questions about arbitrability to the arbitrator. Under the FAA and settled case law, the Court should compel arbitration and stay this case pending completion of arbitration because the parties delegated arbitrability. *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) (when a party requests a stay pending arbitration of arbitrable issues, the FAA compels courts to stay the proceeding).

Alternatively, if the Court declines to compel arbitration, it should enforce the parties' forum-selection clause and transfer this action to the Western District of Washington. Rover respectfully requests such further relief as this Court deems just and proper.

Dated: July 24, 2026

Respectfully submitted,

*s/ Michael D. Meuti*
MICHAEL D. MEUTI (CA 227939)
Benesch, Friedlander, Coplan & Aronoff LLP

Attorneys for Defendant
A Place for Rover, Inc.

I certify that this brief contains 6,038 words, which complies with the word limit of L.R. 11-6.1.